Albert **ROBINSON**, Willie Moore, and John Richardson, individually and on behalf of a class, Plaintiffs–Appellees,

v.

**CITY OF CHICAGO**, an Illinois municipal corporation, Defendant–Appellant.

William **DOULIN** and Benjamin Perlman, individually and on behalf of a class, Plaintiffs–Appellees,

v.

**CITY OF CHICAGO,** Defendant–Appellant.

Nos. 87–1146, 87–1778.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 12, 1987.

Decided Feb. 21, 1989.

Rehearing Denied in No. 87–1146 May 12, 1989.

Rehearing and Rehearing En Banc Denied in No. 87–1778 May 12, 1989.

---

**1.** *See North Georgia Finishing, Inc. v. Di–Chem, Inc.* 419 U.S. 601, 615, 95 S.Ct. 719, 726, 42 L.Ed.2d 751 (1975) (Blackmun, J., dissenting).

Ruth M. Moscovitch, Chief Asst. Corp. Counsel, Ramsay Laing Klaff, Deputy Asst. Corp. Counsel, Chicago, Ill., for defendant-appellant.

Kenneth Flaxman, Chicago, Ill., for plaintiffs-appellees.

Before BAUER, Chief Judge, and RIPPLE and MANION, Circuit Judges.

MANION, Circuit Judge.

Defendant City of Chicago appeals from a judgment in No. 87–1146 declaring unconstitutional its policy permitting investigative detentions and a judgment in No. 87–1778 declaring unconstitutional its policy of detaining misdemeanor arrestees until their fingerprints cleared. Because no named plaintiff in either action had standing to sue, we reverse both judgments. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983).

## I. Nature of the Case in No. 87–1146 (Robinson)

On July 18, 1981, at 5:30 in the morning, a deliberately set fire destroyed an apartment building in Chicago. Four tenants died. Immediately, police detectives interviewed various witnesses. One tenant informed the investigators that plaintiff John Richardson, a former tenant, had been fighting with his girlfriend, Cecilia Saunders, also a tenant. This tenant added that he had learned from another that Richardson had been in the building at about 4:00 that morning. This other person told the detectives that he had seen Richardson in the building in the pre-dawn hours that morning. Another tenant related that Richardson had warned her to leave the building because he was going to "torch" it. Later, one David Pruitt informed the detectives that Richardson had asked him the night before the fire to lure girlfriend Saunders outside the building so that Richardson could shoot her. Based upon this evidence, Chicago police officers arrested Richardson without a warrant at approximately 2:10 p.m. on the day of the fire. *Robinson v. City of Chicago*, 638 F.Supp. 186, 188 (N.D.Ill.1986).

At 6:00 p.m., Whalen and Mannion, two Chicago police detectives, interviewed Richardson for approximately two hours. Richardson proffered as an alibi that he had been with plaintiffs Willie Moore and Albert Robinson throughout the previous night and into the morning. When inter-

viewed by the detectives, Moore and Robinson corroborated Richardson's alibi. Later that night, however, Pruitt repeated to detectives Whalen and Mannion his account that Richardson had asked him the night before the fire to lure his girlfriend outside so that Richardson could shoot her. Faced with this conflict between Richardson's alibi and Pruitt's compelling version, the detectives filled out a form requesting that Richardson be "held over" past the next court call so that the detectives could continue to investigate. The watch commander in the detention facility approved this request.

The police held Richardson pursuant to a policy set out in General Order 78–1 of the Chicago Police Department. Section 6, paragraph C–2 of the General Order authorized police officers to detain arrestees when "there is a necessity for the detention ... for a period of time longer than that which might be routinely expected, in order that they may continue the investigation." This General Order was known as the City's "hold past court call" policy. During a Rule 30(b)(6) deposition, the City's selected representative stated that the policy's purpose was to permit "detective division personnel ... more time to complete their investigation."

The police held Richardson for three days while they continued to investigate, without presenting Richardson to a neutral magistrate. During these three days, the evidence implicating Richardson mounted. Fire department investigators found a charred plastic bottle which contained the accelerant used to start the fire. The investigators then traced the bottle to Richardson. The investigators also learned that Richardson had told his girlfriend that he would burn the building down by pouring gasoline from the second floor down to the first. The fire department's investigation had earlier discovered this was just how the fire started. A gas station attendant picked Richardson out of a lineup as the purchaser of a can of gasoline the night before the fire. On July 20, the police assembled all the witnesses so that an Assistant State's Attorney could interview them. Each of the witnesses repeated their incriminating accounts. In addition, Pruitt's wife reported that Richardson had also asked her to lure his girlfriend outside the building, while still another witness reported that Richardson had also told her several days before the fire that he would burn down the building. Even Richardson's alibi witnesses changed their account and stated that they were not sure that Richardson was with them at the time the fire started.

Finally, on July 21, a grand jury charged Richardson with murder of the four tenants. That evidence notwithstanding, a jury acquitted Richardson.

On August 22, 1983, Richardson and his two alibi witnesses, Robinson and Moore, sued the City and detectives Mannion and Whalen pursuant to 42 U.S.C. § 1983. In plaintiffs' second amended complaint, filed on March 1, 1985, plaintiffs Robinson and Moore sued the detectives, seeking compensatory and punitive damages for their detaining them without probable cause in order to investigate Richardson's alibi. Subsequently, Robinson and Moore settled their claims. Their claims are not at issue in this appeal.

Plaintiff Richardson sued the City both individually and on behalf of a class. Richardson alleged that he was "held in custody for more than two days" pursuant to the General Order and that the General Order violated the Fourth Amendment by authorizing investigative detentions. Richardson sought—for himself and for the class—a declaratory judgment "as to the illegality of the City's investigative detention policy." Richardson also sought compensatory damages of $19.99. Richardson and the City, however, soon settled his damages claim; that claim is not at issue in this appeal either.

Richardson's proposed class for declaratory relief consisted of "[a]ll persons who, from August 17, 1978 to the time of entry of judgment were held in custody without the filing of charges pursuant to Section 6, Paragraph C–2 of General Order 78–1...." Richardson argued that the "hold past court call" policy deprived each member of

the class of rights secured by the Fourth Amendment because it authorized extended detention without a judicial determination of probable cause.

The City moved to dismiss Richardson's complaint on the grounds that he failed to state a claim upon which relief could be granted and that he lacked standing to sue for declaratory relief. After the court denied the City's motion, Richardson moved to certify the proposed class. On February 21, 1986, the court granted Richardson's motion and held that this action could be maintained as a class action pursuant to Fed.R.Civ.P. 23(b)(2) on behalf of "[a]ll persons who from August 17, 1978 to the time of entry of judgment were held in custody without the filing of charges" pursuant to the General Order.

Richardson and the City subsequently filed cross-motions for summary judgment on the prayer for declaratory relief. On June 25, 1986, in a reported opinion, the court denied the City's motion and granted Richardson's cross-motion, concluding that the "hold past court call policy" was unconstitutional:

> Paragraph C–2 permits the exact type of extended detention which the Court in *Gerstein [v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975) ] found repugnant to Fourth Amendment rights. It

specifically provides that an arrestee's detention be extended beyond the time when he would normally be sent before a magistrate so that police officers may continue the investigation. The reasoning behind this policy of extended detention is obvious; to build a case against a defendant while he is in jail. However, the teaching of *Gerstein* ... is clear— hoping to build a case is not a permissible reason for jailing someone indefinitely.

638 F.Supp. at 192.

The next day, the police department issued a teletype order rescinding the "hold past court call" policy. The City subsequently moved to dismiss the action on the grounds that it had been rendered moot by this policy change. The court denied that motion.

 By the time the court entered judgment on December 23, 1986, the damages claims of the three named plaintiffs had already been settled. Thus, what remained was for the district court to enter a declaratory judgment on behalf of the class: the court declared that each class member had been "deprived by defendant City of Chicago of rights secured by the Fourth Amendment to the Constitution of the United States." [1] The City timely ap-

---

**1.** After issuing its memorandum, the district court entered a corresponding judgment order prepared and lodged by Richardson's counsel. This order contained a final paragraph entitled "Reservation of Jurisdiction" in which "the Court expressly reserves jurisdiction to enter such further orders as may be required to effectuate the judgment...." Yet plaintiff did not seek injunctive relief, and could not do so by first placing in the judgment order that he lodged some language about "further orders." The judgment order also "defers until final adjudication of the City's appeal the question of whether notice of any sort is appropriate." It appears that Robinson's counsel, having chosen to seek only declaratory relief under Fed.R.Civ. P. 23(b)(2) to avoid notifying each member of the class, as otherwise would have been required by Fed.R.Civ.P. 23(c)(2), was by carefully crafting the judgment order seeking to protect options that he purposefully gave up earlier. If that were the court's final order, nonetheless, this court would not have jurisdiction to hear this appeal. *See American Interinsurance v. Oc-*

*cidental Fire & Cas.,* 835 F.2d 157, 159 (7th Cir.1987).

Fortunately, in light of the time that has elapsed in the course of this lawsuit over a practice that the City long ago abandoned, the final document in the district court, entitled "judgment in a civil case" and entered by the Clerk, does not include any of Robinson's precatory language about reserving jurisdiction. We presume that the district court, as required by Fed.R.Civ.P. 58(2), approved of the form of the judgment entered by the Clerk. *See American Interinsurance, supra,* 835 F.2d at 160. Thus, the last word from the district court does not contemplate doing anything further and this court has appellate jurisdiction. We only note how ironic it is that the parties wrote pages on the significance of the City's Corporation Counsel's failure to personally sign his own name on the notice of appeal, yet they, along with the district court, did not appreciate, much less discuss, any potential jurisdictional problems with the way that the parties left the case in the district court.

peals.[2]

## II. Nature of the Case in No. 87–1778 (Doulin)

The appeal in No. 87–1778 also presents a challenge to another facet of the City's policy of detaining arrestees. The nature of the case and nature of the proceedings are fully set forth in the district court's opinion reported below as 662 F.Supp. 318. We set forth only those facts necessary to decide the one issue facing this court on appeal.

William Doulin works at and Benjamin Perlman owns a retail jewelry store in Chicago. On October 9, 1981, Chicago police officers arrested Perlman and Doulin for the misdemeanor offense of receipt of stolen jewelry. 662 F.Supp. at 321.

The Chicago Police Department maintains a criminal history or "rap sheet" to which an individual record number ("IR number") is assigned for every individual who is arrested. Each arrestee is identified by his or her fingerprints and is assigned an IR number. After a name check against the rap sheet, all arrestees are fingerprinted because the result of a name check is considered to be tentative; arrestees frequently offer alias identities, give false information regarding the date of their birth, or otherwise lie about who they are. Evidence introduced by the police department at trial showed that over fifty percent of arrestees will lie about their identity if they are arrested for another crime while on probation or parole or while indicted.

Under the same General Order 78–1 at issue in *Robinson*, the Chicago Police Department would detain misdemeanor arrestees while the fingerprints were transported to the Department's Identification Section located at headquarters at 1121 South State Street, where they were analyzed and

---

**2.** To file timely a notice of appeal is "mandatory and jurisdictional." *United States v. Robinson*, 361 U.S. 220, 229, 80 S.Ct. 282, 288, 4 L.Ed.2d 259 (1960). The City's notice of appeal concludes with the name of the Corporation Counsel, Judson Miner, typed below the signature line. Mr. Miner, however, did not sign the notice of appeal. Rather, someone in the Corporation Counsel's office signed the notice of appeal in Mr. Miner's name and placed his initials next to Mr. Miner's supposed signature. As a result, plaintiff argues, this court lacks jurisdiction over the appeal because the notice of appeal was not signed by an attorney "in the attorney's individual name," as required by Fed. R.Civ.P. 11.

We reject plaintiff's contention. Fed.R.Civ.P. 11 requires that "every pleading ... and other paper of a party represented by an attorney shall be signed by at least one attorney of record in the attorney's individual name" and this rule applies to notices of appeal. *Thornton v. Wahl*, 787 F.2d 1151, 1153 (7th Cir.), *cert. denied*, 479 U.S. 851, 107 S.Ct. 181, 93 L.Ed.2d 116 (1986). The City, however, has satisfied both the letter and purpose of Rule 11. Rule 11 reminds an attorney that he is accountable for every pleading he submits on behalf of his client. *See Lewis v. Lenc–Smith Mfg. Co.*, 784 F.2d 829, 830 (7th Cir.1986) (per curiam). Inadequate representation can cost a client important rights; the attorney's signature highlights who is personally responsible.

The Municipal Code of the City of Chicago, Ch. 6, § 6–2(b), makes the Corporation Counsel legally accountable for all matters filed on the City's behalf. As a corollary, anything signed by an authorized agent of his is as if he himself signed it within the meaning of Rule 11. Thus, this is unlike a case submitted by one unrepresented party for another, *see, e.g., Bach v. Coughlin*, 508 F.2d 303, 306 (7th Cir.1974); *Lewis, supra*, 784 F.2d at 830–31; *Church v. Commissioner*, 810 F.2d 19, 20 (2d Cir.1987), or where the pleadings contain no signature, *see, e.g., United States ex rel Sacks v. Philadelphia Health Management Corp.*, 519 F.Supp. 818, 826 n. 9 (E.D.Pa.1981), or just the name of a large firm without a particular individual, *see, e.g., Stewart v. City of Chicago*, 622 F.Supp. 35, 38 (N.D.Ill.1985).

In any event, an unsigned notice of appeal, even if it does not meet the demands of Fed.R. Civ.P. 11, meets the jurisdictional requirements for appeal. *See, e.g., McNeil v. Blackburn*, 802 F.2d 830, 832 (5th Cir.1986) (per curiam); *Lewis, supra*, 784 F.2d at 831; *see also Thiem v. Hertz Corp.*, 732 F.2d 1559, 1562 (11th Cir.1984). Plaintiff points to Fed.R.App.P. 3(c), which provides that "the notice of appeal shall specify the party or parties taking the appeal." Failure to name a party is jurisdictional and requires dismissing the appeal. *See Torres v. Oakland Scavenger Co.*, —— U.S. ——, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988). But naming a party is a specified appellate requirement; a signed notice is not. Thus, while we emphasize that a notice of appeal must be signed, there is nothing in the *Torres* decision, or in our cases applying *Torres*, such as *Allen Archery, Inc. v. Precision Shooting Equipment, Inc.*, 857 F.2d 1176, 1177 (7th Cir. 1988) (per curiam), which suggests that we should dismiss this appeal.

compared to previous criminal records of an arrestee if such records (or outstanding arrest warrants) existed. The prints were transported either by facsimile machine or by police department mail. Fingerprints transported by police department mail were delivered to the Identification Section three times during each eight-hour watch.

At headquarters, the fingerprints were analyzed to ascertain the true identity and criminal record of each arrestee and to determine the existence of any outstanding arrest warrants. Up to and including the time of trial, police department technicians would check fingerprints manually according to the so-called "Henry classification" system and then compare the fingerprints to those filed under the IR number.[3] If the fingerprints matched, the new arrest would be added to the arrestee's rap sheet. If the technicians were unable to match the arrestee's fingerprints with those on file, a new IR number would be assigned to the arrestee. After the updated rap sheet was transmitted to the detention center where an arrestee was being held, the arrestee was considered to have "cleared" fingerprinting.

The Department believed that these fingerprint checks were the only means of positively identifying the arrestee. In addition, a fingerprint check could also reveal prior criminal convictions, prior arrests, prior use of aliases, and prior bond forfeitures, which under Illinois statute are all factors relevant to the setting of a bond or other conditions for pretrial release. Ill. Rev.Stat. ch. 38, ¶ 110–5 (1985). Thus, the Department would wait for fingerprints to clear before allowing a misdemeanor arrestee to post a cash bond at the station or alternatively taking the arrestee before a judge[4] for a probable cause hearing and bond determination. The district court found that—as of the trial in 1986—the

average time for "fingerprint clearing" was four to six hours and that ten percent of all misdemeanor arrestees were held for longer than ten hours while their prints cleared.

Even though Doulin and Perlman were known to the officers, and even though Illinois law provides that a misdemeanor arrestee is to be released on bail upon posting a $100 cash bond, 662 F.Supp. at 321, which Doulin and Perlman each had, both were locked in a cell to await fingerprint clearing, one for six hours and the other for twelve.

On November 3, 1982, Doulin and Perlman filed the original complaint in this case on behalf of themselves and a class of those similarly situated defined as those arrested since 1977 on misdemeanor charges by Chicago police officers and detained pursuant to the City's fingerprint clearing policy. The plaintiffs originally sought injunctive relief and damages on the grounds that this policy, as applied to misdemeanor arrestees, violated the Fourth Amendment's prohibition against unreasonable seizures. They sought a permanent injunction directing the City to abandon the policy. Subsequently, plaintiffs amended the complaint to add on two more named plaintiffs, Vanessa Taylor and Patricia Muhamad, and to also seek declaratory relief.

On July 9, 1984, the court granted the City's motion to dismiss the individual claims for injunctive relief:

> The individual plaintiffs have failed ... to allege that they will again be arrested, charged with a misdemeanor and illegally detained. It may be that some of the plaintiffs are quite likely to again be arrested. For example, Doulin and Perlman may face a particular risk of rearrest if the police are engaged in a concerted effort to ferret out jewelers who buy stolen jewelry. Plaintiffs have not

---

**3.** Since January, 1987, fingerprints have been analyzed under the Automated Fingerprint Identification System (AFIS). This system can accurately match up to one thousand fingerprints in a minute.

**4.** Until May 4, 1985, all misdemeanor arrestees were detained until their fingerprints cleared. On May 4, 1985, the police department adopted

a new General Order requiring that the watch commander waive fingerprint clearance for misdemeanor arrestees who have sufficient personal identification and who check clear on a name check at the station, unless they are charged with an offense which may be raised to a felony.

attempted to factually distinguish *Lyons* in this manner; consequently, the individual claims for injunctive relief must be dismissed.

Memorandum and Order of July 9, 1984, at 5–6. Nonetheless, the court held while the individual plaintiffs did not allege a case or controversy which would justify injunctive relief, the class did. Order of July 9, 1984 at 6. The court then certified a class pursuant to Fed.R.Civ.P. 23(b)(2) consisting of:

> All persons who were arrested on other than a felony charge by a police officer of the City of Chicago on or after November 3, 1977, and who were detained pursuant to the "fingerprint clearing" policy of the City of Chicago....

Order of July 9, 1984 at 9. See 662 F.Supp. at 320.

After putting aside the damages claim until later, the district court held a trial lasting seven days on the issue of the City's liability for declaratory and injunctive relief. On August 26, 1986, the district court issued the reported memorandum opinion holding that the fingerprint clearing policy "as presently constituted is unconstitutional," 662 F.Supp. at 335, because it "infringes upon the rights of misdemeanor arrestees to be released immediately upon posting of bail or to a prompt presentation to a judge or magistrate for a probable cause hearing." 662 F.Supp. at 334. The court found that "one of the principal purposes behind the fingerprint clearing policy—i.e., to identify persons sought in outstanding arrest warrants or stop orders who give false names upon arrest—is unsupported by any statistical evidence," *id.* at 326, and that the "evidence demonstrates that the City of Chicago has turned lengthy post-arrest detentions of misdemeanor arrestees, ostensibly for the purpose of clearing their fingerprints, into the penalty or punishment itself for misdemeanor crimes upon which these arrestees have not been convicted ..." *Id.* at 327. The court permanently enjoined the City from detaining misdemeanor arrestees to wait for their fingerprints to clear unless there exists a "quantum of individualized suspicion" that an arrestee is wanted for other crimes.

Subsequently, on April 20, 1987, the court entered final judgment on behalf of the plaintiff class defined as "[a]ll persons who were arrested on other than a felony charge by a police officer of the City of Chicago on or after November 3, 1977, who had no reasonable probability of having charges against them elevated to a felony charge, and who were detained pursuant to the 'fingerprint clearing' policy of the City of Chicago implemented in police department General Order 78–1." *Id.* at 328. The court enjoined the City from detaining misdemeanor arrestees for fingerprint clearance "where there is no reasonable possibility of having such charges elevated to felony, unless, on the basis of objective factors, there is a reasonable suspicion that the person is not whom he (or she) claims to be or that such person is wanted for other crimes. This discretion shall not extend to persons who voluntarily surrender to answer a misdemeanor warrant." *Id.* at 337. The court further directed the City to issue a new policy within sixty days and to report to plaintiffs' counsel on all persons detained for fingerprint clearance until the policy goes into effect. The court then certified under Fed.R.Civ.P. 54(d) that there was no reason to delay entry of judgment and directed the clerk to enter final judgment for plaintiffs on their claims for declaratory and injunctive relief.

The City timely appealed. After oral argument, on November 13, 1987, this court issued an order staying the district court's judgment until issuance of this opinion.

### III. Analysis

■ Both cases present one question. Not surprisingly, the plaintiffs in both cases were well represented by the same counsel, and the district court in *Doulin* cited with approval the *Robinson* opinion. We resolve this matter by holding that each named plaintiff did not and does not have standing to seek equitable relief either on his own behalf or that of the plaintiff class. The principles that govern the declaratory and injunctive claims of the

*Doulin* plaintiffs apply to Richardson's standing to interpose his declaratory claim. Since the argument is the same, we will analyze the law primarily as to Richardson's facts and then apply that analysis to the *Doulin* plaintiffs as well.

This matter is controlled by *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). In *Lyons*, the plaintiff sued the City of Los Angeles and several of its police officers, alleging that the officers, without provocation, applied a chokehold when they stopped him for a traffic violation. The plaintiff sought damages and an injunction barring chokeholds except where a suspect threatens to use deadly force. The Supreme Court in *Lyons* held that there was no federal jurisdiction over the plaintiff's claim for injunctive relief.

The Court in *Lyons* reasoned that to invoke Article III jurisdiction, a plaintiff seeking injunctive relief must show that he is in immediate danger of sustaining some direct injury. Relying upon *O'Shea v. Littleton*, 414 U.S. 488, 495–96, 94 S.Ct. 669, 675–76, 38 L.Ed.2d 674 (1974), the Court stated that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." The Court found that while the plaintiff may have had standing to seek damages against the individual officers and even the City, he could not establish a real threat that an officer would choke him again:

> [T]o establish an actual controversy ... Lyons would have had not only to allege that he would have another encounter with the police but also to make the incredible assertion either (1) that all police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter ... or (2) that the City ordered or authorized police officers to act in such manner.

*Lyons*, 461 U.S. at 105–06, 103 S.Ct. at 1667 (emphasis in original).

In his case, Richardson does allege that the City had a written policy authorizing officers to detain persons for investigation and the *Doulin* plaintiffs similarly allege that the City had a written policy to detain to await fingerprint clearance. *Cf. E.Z. v. Coler*, 603 F.Supp. 1546, 1551 n. 6 (N.D.Ill. 1985), *aff'd* 801 F.2d 893 (7th Cir.1986). Yet, as with the *Lyons* plaintiff, neither Richardson nor the *Doulin* plaintiffs can allege that it is reasonably likely that they will again encounter the police. *See Palmer v. City of Chicago*, 755 F.2d 560, 572 n. 9 (7th Cir.1985). Because the various plaintiffs' future conduct presumably will give the police no probable cause to arrest them, they cannot expect that they will encounter the police or, if they did, that the police would again detain them pending investigation or fingerprint clearance. Thus, even if the police were to continue to detain others for investigation (at oral argument we were told they no longer do so), the possibility that Richardson would suffer any injury as a result of that practice is too speculative. Richardson has not alleged and has not shown that he is in immediate danger of again being directly injured by the same official conduct challenged as unconstitutional—post-arrest detention for investigation prior to a probable cause hearing. As the district court correctly found, "here, there is no reasonable likelihood that named plaintiff's expired claims will recur." 638 F.Supp. at 190. And as mentioned above, the court in *Doulin* has already found that "[t]he individual plaintiffs have failed ... to allege that they will again be arrested, charged with a misdemeanor and illegally detained." Under *Lyons*, therefore, the court was required to dismiss Richardson's and the *Doulin* plaintiffs' claims for equitable relief for lack of standing.[5] *See Gladden v. Roach*, 864 F.2d 1196 (5th Cir.1989), available on WESTLAW as 1989 WL 3534.

---

**5.** While the *Lyons* plaintiff sought injunctive relief, the same standard and reasoning applies to a plaintiff's claim for declaratory relief. *See, e.g., Smith v. City of Fontana*, 818 F.2d 1411, 1421 n. 17 (9th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 311, 98 L.Ed.2d 269 (1987). The declaratory relief statute is not an independent basis of jurisdiction and requires an "actual controversy."

The Ninth Circuit has adopted a rule that where a plaintiff's claims for damages and declaratory relief are predicated on a single legal theory requiring development of the same facts, and a live controversy exists between the plaintiff and defendant for a damages claim, then federal jurisdiction exists over the declaratory relief claim as well. *See Smith v. City of Fontana,* 818 F.2d 1411, 1422–23 (9th Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 311, 98 L.Ed.2d 269 (1987). In *Smith,* the Ninth Circuit distinguished *Lyons* on the grounds that there the district court had severed the damages claim from the injunctive claim, so that the Supreme Court was considering the injunctive claim alone:

> *Lyons* and its progeny do not preclude the exercise of federal jurisdiction when a plaintiff brings both a claim for damages and a related claim for equitable relief in the same lawsuit.
>
> \* \* \* \* \* \*
>
> [Where a plaintiff] had to establish all of the facts necessary to support her claim for equitable relief in order to win her damages claim, ... she "demonstrate[d] a 'personal stake in the outcome' " of her claim for equitable relief sufficient to " 'assure that concrete adverseness' necessary for the proper resolution of constitutional questions." *Lyons,* 461 U.S. at 101, 103 S.Ct. at 1665 (citations omitted).

818 F.2d at 1422.

We read *Lyons* differently. In *Lyons,* the Court carefully distinguished between the floating damages claim, for which standing existed, and the injunctive claim, for which it did not. The D.C. Circuit correctly summarized *Lyons* when it read *Lyons* as holding that "although damage standing available, injunctive standing not." *Nat. Maritime Union v. Commander, MSC,* 824 F.2d 1228, 1234 (D.C.Cir. 1987). In addition to faithfully interpreting *Lyons,* this also presents the better rule. The plaintiffs cannot show irreparable injury precisely because they cannot show a real or immediate threat that they will be wronged again, while any previous injury can be and was compensated for by dam-

ages. In this regard, the Court noted that the proper balance between state and federal spheres of authority cautions against enjoining state officers administering a state's criminal laws where there is no irreparable injury. *Lyons,* 461 U.S. at 112–13, 103 S.Ct. at 1670–71.

Trying to save his equitable claim, Richardson contends that his quest for declaratory relief properly falls within federal jurisdiction because temporary investigative detentions are "capable of repetition yet evading review." The "capable of repetition, yet evading review" doctrine applies where a claim is so transitory that a plaintiff may have standing when litigation begins but loses it—loses his personal stake—as the litigation continues. This doctrine, however, "applies ... only when repetition is likely to embroil the same parties to the dispute." *Holmes v. Fisher,* 854 F.2d 229, 232 (7th Cir.1988). Because the plaintiff faces a reasonable likelihood of being in the same situation again, "vigorous advocacy can be expected to continue." *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 398, 100 S.Ct. 1202, 1209, 63 L.Ed.2d 479 (1980). The capable-of-repetition doctrine does not apply except in those exceptional situations where a plaintiff can reasonably show that he will again be subject to the alleged illegality. *Lyons,* 461 U.S. at 110, 103 S.Ct. at 1669; *see also Tucker v. Phyfer,* 819 F.2d 1030, 1034 n. 4 & 1035 (11th Cir.1987).

Richardson in response contends that the class has standing: as the class consisted of all in custody pursuant to the General Order up to the date of judgment, someone in the class had to have had standing at the time the complaint was filed as well as at the time the class was certified. Without any evidence, Richardson claims that several hundred unnamed members of the class were subject to detention in the five years prior to the entry of judgment. Thus, Richardson argues, "the constant existence of a class of persons suffering from the deprivation is certain." *Gerstein v. Pugh,* 420 U.S. 103, 110 n. 11, 95 S.Ct. 854, 861 n. 11, 43 L.Ed.2d 54 (1975), and "new persons with 'live' claims for injunctive relief ...

are constantly entering the category of those currently subject to defendants' alleged practice." *Lewis v. Tully*, 99 F.R.D. 632, 644 (N.D.Ill.1983), *disagreed with by Boston v. City of Chicago*, No. 86–C–5534 (N.D.Ill. Mar. 28, 1988), found at 1988 WL 31532; *Williams v. City of Chicago*, 609 F.Supp. 1017 (N.D.Ill.1985).

If Richardson's position were correct, the *Lyons* plaintiff could have acquired standing simply by pleading his claim as a class action. Instead, *Lyons* relied upon *O'Shea, supra*, 414 U.S. at 494, 94 S.Ct. at 675, where the Court held that a class does not become a separate entity until it is certified and, in turn, that a class will not be certified unless the named plaintiff has standing at that time.

In *Gerstein, supra*, two Florida pretrial detainees arrested under a prosecutor's information filed a class action seeking a declaration and injunction that they were entitled to a judicial determination of probable cause. The record did not indicate whether the named plaintiffs were still detained at the time the district court certified the class, and they had been convicted by the time of oral argument before the Supreme Court. 420 U.S. at 110 n. 11, 95 S.Ct. at 861 n. 11. Because it was "by no means certain that any given individual, named as plaintiff, would be in pretrial custody long enough for a district judge to certify the class," the Court in *Gerstein* allowed an exception to the rule that mootness of a class representative's claim moots the class claims. 420 U.S. at 110 n. 11, 95 S.Ct. at 861 n. 11. But a representative's claim must at least be live when he files the case, even if the representative's case becomes moot before the class is certified. *See Geraghty*, 445 U.S. at 403–04, 100 S.Ct. at 1212–13 ("an action brought on behalf of a class does not become moot upon expiration of the named plaintiff's substantive claim...."); *Holmes, supra*, 854 F.2d at 232. In contrast, Richardson never had a stake in the declaratory relief to lose; "[t]his case was dead on arrival, moot the day the complaint was filed. So far as equitable relief was concerned, there was *never* a case or controversy within the meaning of Art. III of the Constitution.

*Geraghty* does not breathe life into a still-born case." *Holmes, supra*, 854 F.2d at 232; *see Foster v. Center Township*, 798 F.2d 237, 245 (7th Cir.1986). "To permit the certification of a class headed by a 'representative' who did not have a live controversy with the defendant on the day the suit began would be to jettison the last vestiges of the case-or-controversy requirement in class actions." *Holmes, supra*, 854 F.2d at 233.

We recognize that the pragmatics of the situation in which Richardson and the *Doulin* plaintiffs found themselves suggest no significant possibility that a putative plaintiff would have enough time while detained to file suit; the challenged governmental conduct is limited temporally. Our holding, however, does not mean that there is and would have been no way to challenge the "hold past court call" policy: any findings the court made in awarding damages could have precluded the City from relitigating the merits of its policy. Robinson could have achieved the same result as reached here by suing the City for damages; the court's holding that the General Order was unconstitutional would have served as *res judicata* in any subsequent action. Robinson most likely chose not to pursue class-wide damages to avoid the attendant notice requirements, but "[t]here is no need to throw away a venerable constitutional rule just to retain a replaceable champion." *Holmes, supra*, 854 F.2d at 233. The *Doulin* plaintiffs, in comparison, still retain a pending damages claim.

IV. Conclusion

The district court in No. 87–1146 (Robinson) should have dismissed Richardson's claim for declaratory relief as soon as it was filed. The district court in No. 87–1778 (Doulin) should have similarly dismissed the claims of plaintiffs there for declaratory and injunctive relief. As noted, however, a properly filed damages claim remains pending, and we do not see any reason why the district court could not rely in full on its previous findings of fact.

The district court's judgments in Nos. 87–1146 and 87–1778 are REVERSED.