**Maceo G. WILLIS, Jr., Plaintiff,**

v.

**Ernest BELL, et al., Defendants.**

**No. 86 C 9589.**

United States District Court,
N.D. Illinois, E.D.

Dec. 4, 1989.

Robert O. Case, Jeffrey Schiller, and Michael Braun, Schuyler, Roche & Zwirner, Chicago, Ill., for plaintiff.

Diane J. Larsen and Kelly R. Welsh, Corp. Counsel, Chicago, Ill., for defendants.

MEMORANDUM OPINION
AND ORDER [1]

SHADUR, District Judge.

Maceo Willis ("Willis") has sued several City of Chicago ("City") police officers (collectively "Officers"),[2] Chicago Police Superintendent LeRoy Martin ("Martin") [3] and City itself under 42 U.S.C. § 1983 ("Section 1983"), claiming numerous violations of Willis' constitutional rights incident to his arrest and detention by Officers from February 11 to 13, 1985.[4] In May 1988 all defendants moved for summary judgment under Rule 56. This Court's May 27, 1988 memorandum opinion and order (the "Opinion," 687 F.Supp. 380 [5]) dismissed several of Willis' claims on grounds stated there.[6] Only two of Willis' claims—those challenging the length and conditions of his detention before he received a hearing—survived that first round of attack.

1. This opinion deals with simultaneously-briefed cross-motions for summary judgment. To avoid confusion in referring to the six legal memoranda, they will be cited this way:
    1. Those addressing plaintiff's motion will be cited "P.Mem.—," "D.Ans.Mem.—" and "P.R.Mem.—."
    2. Those addressing defendants' motion will be cited "D.Mem.—," "P.Ans.Mem.—" and "D.R.Mem.—."
    As for the motions themselves, they will be cited simply "P.Mo.—" and D.Mo.—."

2. Defendant Officers are Ernest Bell ("Bell"), Leonard Kukulka ("Kukulka"), A. Jones, Jr. ("Jones") and T. O'Connor ("O'Connor"). Willis' Third Amended Complaint (the "Complaint") identifies Kukulka as "Leonard Kukula" throughout. Because defendants' answer and memoranda consistently spell his name with three "ks," this opinion adheres to that spelling.

3. See Appendix for an explanation of why this Court hereby orders the substitution of Martin for former Superintendent Fred Rice (originally named as a defendant here) pursuant to Fed.R.Civ.P. ("Rule") 25(d)(1). This opinion will hereafter refer only to Martin.

4. Initially the Complaint also included a pendent state law claim for alleged violations of the Illinois Code of Criminal Procedure, Ill.Rev.Stat. ch. 38, ¶¶ 100–1 to 125–4. In its first written opinion in this case (669 F.Supp. 229, 231–34 (N.D.Ill.1987)) this Court declined to exercise pendent jurisdiction over the Illinois claim because Illinois law was unsettled.

5. Citations to the Opinion will take the form "Opinion at —," referring only to the F.Supp. page number without repeating the volume number.

6. When the Opinion was written, the preexisting case law in this Circuit—though not entirely uniform in that respect—had given a restrictive reading to the availability of Section 1983 for certain kinds of prisoner claims in light of the Supreme Court's decisions in *Preiser v. Rodriguez*, 411 U.S. 475, 494, 499 n. 14, 500, 93 S.Ct. 1827, 1839, 1841 n. 14, 1841, 36 L.Ed.2d 439 (1973) and *Wolff v. McDonnell*, 418 U.S. 539, 554–55, 94 S.Ct. 2963, 2973–74, 41 L.Ed.2d 935 (1974). This Court therefore adhered, as it was bound to do, to the teaching of *Hanson v. Heckel*, 791 F.2d 93, 96 (7th Cir.1986) (per curiam) as reconfirmed in *Crump v. Lane*, 807 F.2d 1394, 1400–01 (7th Cir.1986)—see Opinion at 384. Since then, however, *Viens v. Daniels*, 871 F.2d 1328 (7th Cir.1989) has not only noted the "significant tension between the Supreme Court's decisions in *Preiser* and *Wolff*, on the one hand, and our own decisions in *Hanson* and *Crump*, on the other" (*id.* at 1333) but has materially limited the scope of the doctrine announced in the latter two cases (*id.* at 1333–34). It is therefore in order for the parties to revisit the holdings in Opinion at 384–85 in view of *Viens'* "new look," to see whether one or more of Willis' claims dismissed in the Opinion should be revived. As the "Conclusion" section of this opinion reflects, that subject will be among those addressed at the next status hearing.

Now Kukulka and O'Connor have moved for summary judgment on Count I of Willis' Third Amended Complaint ("Complaint") concerning the conditions of Willis' detention. City and Martin have moved for summary judgment on Count II of the Complaint concerning the length of Willis' detention before he received a hearing. Willis has filed a cross-motion for summary judgment on Count II only. For the reasons stated in this memorandum opinion and order:

    1. Kukulka's and O'Connor's motion is denied.

    2. City's and Martin's motion is denied and Willis' corresponding cross-motion is granted.

### Facts [7]

Opinion at 383 set out a brief factual background—all that was needed in the context of the then-pending motion. Because the current Rule 56 motions concern a considerably narrower set of issues and stand on a different footing, it is necessary to recapitulate the now-relevant facts.

At about 9 a.m. February 11, 1985 [8] Officers met Willis at his place of employment and urged him to accompany them to police headquarters to aid the police in an investigation. Willis agreed and went with Officers to Area 3 Violent Crimes Police Headquarters at 39th and California. Shortly after Willis' arrival at Area 3 (about 1:30 p.m.) Jones prepared an arrest report on Willis. There was no warrant for the arrest.

Willis remained at Area 3 in the custody of Kukulka and O'Connor [9] until approximately 11 p.m. During that time Willis was placed in a series of lineups resulting in his identification by eight witnesses regarding seven separate sexual assaults. By 7 p.m. the lineups had concluded. At 9 p.m. an Assistant State's Attorney approved filing charges against Willis, and Kukulka immediately drafted the criminal complaints and felony minute sheets.

At 11:45 p.m. Willis was transported to the 9th District Police Station lockup and the police began to process him. At 4:15 a.m. February 12 the 9th District watch commander, or another police officer authorized by the watch commander, approved the charges against Willis. That concluded the processing.

Instead of Willis being taken to court at that point (a subject dealt with a bit later in this factual summary), Willis remained in police hands for different purposes. Early in the afternoon of February 12 he was moved from the 9th District lockup to Area 2 Violent Crimes Police Headquarters to allow the Area 2 officers to place Willis in another series of lineups—this time relating to the investigation of other sexual assaults—that the police scheduled for 8 p.m. that evening. No arrest warrant had been issued against Willis for those crimes either.

No Area 2 lineups were ever conducted, because the police were unable to locate enough men fitting Willis' general description. Thus the only witness the police sum-

---

**7.** Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is called on to draw all "reasonable inferences, not every conceivable inference" in the light most favorable to the nonmovant (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir.1987)). Each cross-motion has been looked at in those terms.

**8.** All further dates without year references will also refer to 1985.

**9.** Bell and Jones drop out of the present story at this point. D.Mo. 1 n. 1 advises:

    By agreement of the parties, this motion for summary judgment is not presently being brought on behalf of Officer Ernest Bell or Officer A. Jones, Jr. These two police officers, as members of the Patrol Division, were solely arresting officers, who were not responsible for the conditions of plaintiff's detention after arrest. When plaintiff was taken into custody, he was turned over to Area 3 detectives T. O'Connor and Leonard Kukulka, who, as members of the Detective Division, were responsible for plaintiff's detention. The parties are attempting to reach an agreement regarding dismissal of Patrol Officers Bell and Jones. Should such an agreement not be reached, defendants reserve the right to bring a motion for summary judgment on behalf of Bell and Jones.

moned to Area 2 viewed a photographic rather than corporeal lineup and was unable to identify Willis. No charges against Willis resulted from the Area 2 investigation. Willis was returned to the 9th District lockup some time after 9 p.m. February 12.

On February 13 Willis had a bond hearing. Bond was set at $300,000. Willis could not post bond and remained in custody. Later that day a grand jury indicted Willis for four sexual assaults.

Chicago Police Department ("Department") General Order ("GO") 78-1 establishes a general policy requiring that each arrestee be brought to court on the first available court date after the completion of processing. GO 78-1 ¶ VI.C.2 ("Paragraph C-2") recognizes an exception to that policy:

> 2. Extended Detention
>
> a. In the event Criminal Investigation Division personnel ascertain that there is a necessity for the detention of an arrestee for a period of time longer than that which might routinely be expected, in order that they may continue the investigation, a request for such detention will be made by the unit commanding officer or the area coordinator to the watch commander of the facility where the arrestee is detained.
>
> b. The watch commander will ordinarily honor such requests....

There was in fact a 9:30 a.m. holiday court call on February 12.[10] Although the booking procedure on the Area 3 charges had been completed in plenty of time for Willis to appear at that February 12 court call, Willis was held past that call pursuant to Paragraph C-2. Indeed, he was not arraigned until February 13.

### Conditions of Detention

Complaint Count I charges Kukulka and O'Connor with having violated Willis' Fourteenth Amendment due process rights by (1) not feeding him and (2) not allowing him to use the washroom during the 12-hour period that he was in their custody on February 11. This opinion will consider the first of those claims in detail, then turn briefly to the second.

Though Kukulka and O'Connor dispute Willis' claim that he was not offered nor did he eat any food during the entire time he was at Area 3, they recognize Willis' version must be accepted for current purposes. They contend they are nevertheless entitled to judgment as a matter of law because, they say:

> 1. There is no constitutionally protected right to food during a 12-hour detention period.
>
> 2. Even if such a right exists, Willis cannot show a deprivation of that right in violation of the Constitution.
>
> 3. Willis cannot prove Kukulka and O'Connor intentionally deprived him of his rights.
>
> 4. Even if a constitutional violation did occur, Kukulka and O'Connor are entitled to qualified immunity.

Willis responds that resolution of the first three issues requires their presentation to a trier of fact and, as to the fourth issue, that qualified immunity is inappropriate in this setting. This Court agrees with Willis on both scores.

*Donald v. Polk County,* 836 F.2d 376, 379 (7th Cir.1988) teaches that to prevail on a Section 1983 due process claim a plaintiff must prove [11] that (1) plaintiff held a constitutionally protected right, (2) plaintiff was deprived of that right in violation of the Constitution, (3) defendants intentionally caused the deprivation and (4) defendants acted under color of law. Of course Kukulka and O'Connor concede that they acted under color of law, so they

---

**10.** Because February 12 was an official holiday (Lincoln's birthday), a special holiday court call schedule was in effect.

**11.** It is important to remember that in the context of defendants' Rule 56 motion it is really inaccurate to speak of what Willis must "prove." All he has to do to defeat summary judgment is to establish the existence of a genuine issue of material fact as to the issues he would have to prove at trial—and no weighing of the witnesses' credibility is permitted for that purpose.

direct all their energies toward refuting the existence of the first three factors.

■ They first urge this Court to find as a matter of law that 12 hours without food does not constitute a "genuine privation[ ] and hardship over an extended period of time" so as to implicate the Due Process Clause in the manner set out in *Bell v. Wolfish*, 441 U.S. 520, 542, 99 S.Ct. 1861, 1875, 60 L.Ed.2d 447 (1979). *Bell, id.* at 538, 99 S.Ct. at 1873 (citations omitted) focuses the constitutional evaluation of pretrial detention conditions on the issue of punishment:

> A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose.... Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]."

While deprivation of food for 12 hours may not strike defendants as particularly harsh,[12] no legitimate governmental purpose has been (or could be) offered as justification for that deprivation. Certainly

the trier of fact could reasonably find the deprivation of food here was intentional and calculated to punish Willis. Such a conclusion finds theoretical support in another area of constitutional jurisprudence: determinations of the voluntariness of consent to search and seizure under the Fourth Amendment.[13] In that context *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973) and like cases have looked to the totality of circumstances surrounding the consent and have identified "the use of physical punishment such as the deprivation of food or sleep" as one factor to be considered in deciding voluntariness. If deprivation of food can be characterized as punishment for that purpose, it may rationally be viewed as punitive in the present setting as well.

■ As a fallback position if they were to lose on the basic due process right-not-to-be-deprived-of-food issue (as they just have), Kukulka and O'Connor say that Willis will be unable to make the second *Donald* showing—that Kukulka and O'Connor intentionally infringed that right in violation of the Constitution.[14] They offer no cogent support for that mystifying contention. After all, if a trier of fact credits Willis' story sufficiently for him to get past the first hurdle, the second poses no other

---

**12.** Willis' counsel correctly point out that the deprivation of food throughout the 12 hours that Willis was in the actual physical custody of Kukulka and O'Connor significantly understates the factual picture to be presented to the trier of fact in two respects:

1. Because the Officers picked up Willis at his job at 9 a.m. February 11, Kukulka and O'Connor knew that at least two hours (and in all likelihood more) had to be added at the front end of the period to the total time Willis was compelled to go without food.

2. Kukulka and O'Connor also knew that once Willis was transported to the lockup, Police Department policy would provide him with food before next morning's breakfast only upon his request (and they did not inform him of *that* fact so that he would be aware of the need to make such a request).

Thus the food deprivation ascribable to Kukulka and O'Connor could be viewed by the factfinder as substantially more protracted than the 12 hours during which Willis was actually in their hands. Relatedly, their failure to advise him of the need to make the request after he left

their custody might rationally be perceived by the factfinder as evidence of an intent to punish him by the entire protracted deprivation of food.

**13.** As always, this opinion adheres to the conventional and convenient (though technically imprecise) practice of referring to the Fourth Amendment's underlying Bill of Rights provision (which of course imposes limitations only on the federal government) rather than to the Fourteenth Amendment (which applies to state actors and has been construed to embody such Bill of Rights guaranties).

**14.** Throughout this and the following discussion, all references to "intent" should be read with recognition that "deliberate indifference" has regularly been treated as permissibly creating the inference that the prohibited intent was present (see, e.g., *DeShaney v. Winnebago County Department of Social Services*, —— U.S. ——, 109 S.Ct. 998, 1005 n. 5, 103 L.Ed.2d 249 (1989) and cases cited there).

(or greater) difficulty. Once it has been established that extended deprivation of food *can* constitute intentional due-process-violative punishment (the *Bell v. Wolfish* standard), the second *Donald* step is simply to show that the alleged deprivation and intent were *in fact* present.[15]

Kukulka and O'Connor launch still another direct attack on Willis' detention condition claim: They contend that because Willis cannot specifically identify any officer from whom he requested food, he cannot prove Kukulka or O'Connor intentionally deprived him. They seek to link that absence of identification with the statement in *Wolf-Lillie v. Sonquist,* 699 F.2d 864, 869 (7th Cir.1983) (emphasis in original) that "[a]n *individual* cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation."

What Kukulka and O'Connor gloss over (or ignore entirely) is that this is not at all a vicarious-responsibility claim of the type rejected in *Wolf-Lillie.* They were *personally* in control of Willis throughout the extended period of food deprivation. They were *personally* aware that the 12–hour period in their custody had been preceded by another indeterminate but substantial number of hours during which Willis had not had access to food. They were *personally* aware of the limitations on Willis' obtaining food once he was transported to the lockup, further extending the period of deprivation—and they *personally* did not advise him of those limitations. If a trier of fact were to find in that factual matrix that Kukulka and O'Connor intentionally withheld offering sustenance to Willis during the 12 hours he was in their custody and did so with punitive motives, they assuredly "caused or participated in" the constitutional deprivation regardless of whom Willis asked for food during that interval (or for that matter whether he asked at all).

Of course, at trial the factfinder could determine instead that Kukulka's and O'Connor's lack of attention to the conditions of Willis' detention was merely negligent and thus not in derogation of Willis' due process rights (*Daniels v. Williams,* 474 U.S. 327, 335–36, 106 S.Ct. 662, 667, 88 L.Ed.2d 662 (1986) and *Davidson v. Cannon,* 474 U.S. 344, 347–48, 106 S.Ct. 668, 670–71, 88 L.Ed.2d 677 (1986)). But if the factfinder's evaluation *were* one of intentional deprivation (or an equivalent deliberate indifference), the situation would be comparable in law to that held a Section 1983 violation in *Wood v. Worachek,* 618 F.2d 1225, 1233 (7th Cir.1980).

Finally, Kukulka and O'Connor advance a last-ditch defense of qualified immunity from Willis' conditions-of-detention claim. On that score *Doe v. Bobbitt,* 881 F.2d 510, 511 (7th Cir.1989) has recently reconfirmed the principle that qualified immunity protects a public official from damages liability whenever the official's conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." To that end *Doe* cited *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) for the proposition that:

> While the very act in question need not have been held unlawful, the unlawfulness of the official's conduct must have been apparent in light of preexisting law.

Thus the current issue—given the need to draw all reasonable inferences in Willis' favor—is whether Kukulka and O'Connor objectively should have known that their intentional withholding of food from Willis in order to punish him violated a clearly established constitutional right. In light of (1) the preexisting firmly-established *Bell v. Wolfish* standard that *any* intentional imposition of a disability on a pretrial detainee, if not related to a legitimate governmental purpose, may equate to punishment and (2) the consistent recognition, in the closely analogous context of voluntary consents under the Fourth Amendment, that deliberate food deprivation amounts to

---

**15.** Kukulka and O'Connor erroneously conflate the first two *Donald* issues by invoking *Wilkins v. May,* 872 F.2d 190, 195 (7th Cir.1989) to impose a separate "shocks the conscience" test at the second step. *Wilkins* rather employed that standard at the first step, to define the nature of the constitutional right to be free from severe bodily or mental harm.

physical punishment, that question really answers itself. *Lojuk v. Johnson,* 770 F.2d 619, 628 (7th Cir.1985), as reconfirmed and quoted in *Rakovich v. Wade,* 850 F.2d 1180, 1209 (7th Cir.1988), strongly supports this conclusion:

> While cases involving the exact fact pattern at bar are unnecessary, case law in a closely analogous area is crucial to permit us to conclude that reasonably diligent government officials would have known of the case law, related it to the situation at hand, and molded their conduct accordingly.

Kukulka and O'Connor may (and in light of the above holdings *must*) argue to a trier of fact that they did not intentionally violate Willis' rights. But they cannot be heard to say that they did not know such an unjustified, intentional and protracted failure to provide a pretrial detainee with sustenance would violate his due process right to be free from punishment.

As for Willis' claim that he was deprived of use of the washroom during the same protracted period, the identical legal analysis clearly applies with equal force to that claimed deprivation. And once again genuine issues of material fact exist with respect to that claim. Accordingly the Kukulka–O'Connor motion for summary judgment on both Willis' conditions-of-detention claims is denied.

### Length of Detention

City and Martin seek summary judgment on Willis' Count II length-of-detention claim, asserting:

1. Willis' claim against Martin in his official capacity should be dismissed as duplicative of the claim against City.

2. As a matter of law, City did not violate Willis' right to a prompt court hearing after his arrest.

Willis meets those contentions head-on, claiming:

1. Martin as well as City is a proper party to the Count II claim.

2. As a matter of law, City and Martin *did* violate Willis' right to a prompt court hearing following his arrest.

■■■■ On the first (and substantively insignificant) issue, Martin is right: Any official capacity claim against him is wholly redundant, calling for its dismissal. But on the second and substantive issue, this Court agrees with Willis: City violated his constitutional right to a prompt judicial hearing.

*Jungels v. Pierce,* 825 F.2d 1127, 1129 (7th Cir.1987) confirms the now familiar proposition that whenever a complaint names both a municipality and one of its officials sued only in his or her official capacity, "[a]ctually there is only one defendant—the City—not two." Because adding the official-capacity claim in the present situation "makes no practical difference" (*id.*), there is no reason to retain Martin as a party to this action. Consequently he is dismissed.

As for the cross-summary judgment motions on the merits of Willis' extended-detention claim, it requires no more than a brief review of the authorities to confirm just how solidly the established law favors Willis. Both on its face and as applied in this situation, Paragraph C–2 violated [16] Fourth Amendment standards by depriving Willis (and others held under like circumstances) of the right to be free from extended detention without determination of probable cause by a neutral and detached judicial officer.

*Robinson,* 638 F.Supp. at 191–93 considered the precise issue raised here and determined that Paragraph C–2 breached Fourth Amendment standards.[17] For that

---

**16.** Use of the past tense is in order here: This Court has been told by the parties that Department rescinded the extended detention policy of Paragraph C–2 in June 1986, after this Court's then colleague Honorable George Leighton held that provision unconstitutional in *Robinson v. City of Chicago,* 638 F.Supp. 186, 191–93 (N.D. Ill.1986), rev'd on other grounds unrelated to

the merits (lack of standing), 868 F.2d 959 (7th Cir.1989).

**17.** Another of this Court's colleagues, Honorable Ilana Rovner, considered a similar issue and reached the same result in *Doulin v. City of Chicago,* 662 F.Supp. 318, 331–35 (N.D.Ill.1986), rev'd on other grounds unrelated to the merits (lack of standing), 868 F.2d 959 (7th Cir.1989).

purpose *Robinson* relied on the holding in *Gerstein v. Pugh,* 420 U.S. 103, 114, 95 S.Ct. 854, 863, 43 L.Ed.2d 54 (1973) "that the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest." *Robinson,* 638 F.Supp. at 192 (citation omitted) explained:

> Paragraph C–2 permits the exact type of extended detention which the Court in *Gerstein* found repugnant to Fourth Amendment rights. It specifically provides that an arrestee's detention be extended beyond the time when he would normally be sent before a magistrate so that police officers may continue the investigation. The reasoning behind this policy of extended detention is obvious; to build a case against a defendant while he is in jail. However, the teaching of *Gerstein* in this regard is clear—hoping to build a case is not a permissible reason for jailing someone indefinitely.

This Court is in full agreement with the reasoning and result of *Robinson* and, rejecting City's protestations, finds the same result must obtain here.

City argues it did not violate Willis' rights because it had probable cause to detain him for lineups as to other possible charges. That assertion betrays a basic misapprehension of *Gerstein*'s teaching. It is true that *Gerstein,* 420 U.S. at 120 & n. 21, 95 S.Ct. at 866 & n. 21 does (as City claims) identify the standard for determining probable cause to arrest. But *Gerstein* makes that statement only in the context of explaining why a nonadversary proceeding before a *judicial* officer—the neutral and detached magistrate—suffices for the probable cause determination required by the Fourth Amendment, rather than the formal adversarial procedures normally required in other criminal court proceedings. Nowhere does *Gerstein* say that merely because the standards are the same, the *police* can dispense with a probable cause

hearing and make that determination themselves.

On the contrary, any such reading would fly directly in the face of the express edict in *Gerstein, id.* at 114, 95 S.Ct. at 863:

> Once the suspect is in custody ... the reasons that justify dispensing with the magistrate's neutral judgment evaporate. There no longer is any danger that the suspect will escape or commit further crimes while the police submit their evidence to the magistrate. And, while the State's reasons for taking summary action subside, the suspect's need for a neutral determination of probable cause increases significantly.

Indeed, after particularizing such need, *Gerstein* went on to stress its ultimate holding—controlling here—not once but twice (*id.* and *id.* at 124–25, 95 S.Ct. at 868–69 (footnotes omitted)):

> Accordingly, we hold that the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest.

> \*    \*    \*    \*    \*    \*

> Whatever procedure a State may adopt, it must provide a fair and reliable determination of probable cause as a condition for any significant pretrial restraint of liberty, and this determination must be made by a judicial officer either before or promptly after arrest.

City also makes the related argument that the contemplated Area 2 lineups were part of "the administrative steps incident to arrest"—steps for which "a brief period of detention" is allowed under *Gerstein,* 420 U.S. at 113–14, 95 S.Ct. at 862–63. But investigating Willis' possible complicity in a set of crimes other than the ones for which he had been arrested simply does not qualify as an "administrative step incident to arrest." Willis was arrested, put in lineups, charged, booked and processed before 4:15 a.m. February 12. At that point the

*Doulin* addressed the Fourth Amendment rights of misdemeanor arrestees and invalidated City's policy of holding such individuals for six hours pending fingerprinting. Though not on all fours with the case at bar, *Doulin* too offers an articulate exposition of the Fourth Amendment and lends support to the result reached here. Because *Robinson* is directly parallel to this case while *Doulin* is not, this opinion refers more directly to the reasoning in *Robinson.*

administrative incidents of his arrest were complete, and he should have been brought before a magistrate for a *Gerstein* probable cause hearing at the next available opportunity—9:30 a.m. February 12.

Instead, City's Paragraph C–2 called for Willis to be retained in custody without that constitutionally-compelled hearing, in the hope that a case could be built against him on a second set of crimes—all this while he remained in jail pursuant to a warrantless arrest on the first set of crimes. Under *Llaguno v. Mingey*, 763 F.2d 1560, 1567–68 (7th Cir.1985) that kind of fishing expedition cannot justify such extended detention without a hearing before a magistrate.

Indeed, the facts make it all too plain that Willis' situation presented none of the exigencies that might arguably provide justification for the police's arrest and processing of a suspect on the strength of the police's own determination of probable cause. Bringing Willis to the 9:30 a.m. February 12 court call would *not* have posed any impediment to placing him in the Area 2 lineups scheduled for 8 p.m. that evening. City's police personnel could readily have asked the magistrate to make a determination as to probable cause on the initial set of crimes, while at the same time presenting to the magistrate the facts that led the police to believe they had probable cause to detain Willis further on the other offenses as well. That course of action would have afforded full protection to Willis' liberty rights without in any respect impeding City's effort to control crime—thus striking the balance contemplated by *Gerstein* and its progeny.

Finally, City urges that because Willis was unable to post the $300,000 bond that the magistrate ultimately set on the original aggravated assault charges, his claim must fail for lack of causation. City did not cause any deprivation of liberty without due process, the argument goes, because even if Willis had been brought to Court on February 12 he would have remained in detention at Cook County Jail after his hearing.

That "no harm, no foul" contention fails for two reasons. First, while *Donald*, 836 F.2d at 380–81 does hold that delay in holding a hearing causes no harm where a timely hearing would have led to the same result,[18] the selfsame opinion (*id.*) makes it plain that its teaching applies only where the delay in question was justified. This opinion has already explained that *no* justification existed for the delay in this case. Second, Willis here relies on his procedural due process right to a swift probable cause hearing before a magistrate—and on that score *Carey v. Piphus*, 435 U.S. 247, 266, 98 S.Ct. 1042, 1053, 55 L.Ed.2d 252 (1978) (citations and footnote omitted) holds directly:

> Because the right to procedural due process is "absolute" in the sense that it does not depend upon the merits of a claimant's substantive assertions, and because of the importance to organized society that procedural due process be observed, ... we believe that the denial of procedural due process should be actionable for nominal damages without proof of actual injury.

Thus the Supreme Court has explicitly rejected the "no harm, no foul" argument in the procedural due process context[19]—and the Court of Appeals' ruling in *Donald* cannot of course be read as overriding that Supreme Court holding.

All this has, of course, spelled defeat for City's summary judgment motion. But it has done more. On each of the issues discussed in this section, the answer is the same even if all reasonable factual inferences are drawn in City's favor rather than in Willis' favor. Thus there are no material factual issues on Willis' countermotion under Rule 56.

---

**18.** Defendants proffered a related but slightly different "no harm, no foul" argument in their first summary judgment motion. That argument also failed—but due to shortcomings other than those discussed here (Opinion at 387).

**19.** That holding in *Carey* was reconfirmed in *Memphis Community School District v. Stachura*, 477 U.S. 299, 308 n. 11, 106 S.Ct. 2537, 2543 n. 11, 91 L.Ed.2d 249 (1986).

In summary it must be concluded that City, by applying the policy set out in former Paragraph C–2,[20] detained Willis beyond the time needed to perform the administrative steps incident to his arrest. By doing that instead of bringing Willis before a magistrate, City violated his procedural due process rights. Willis is entitled to a judgment on Count II as a matter of law.

### Conclusion

Kukulka's and O'Connor's motion for summary judgment on Count I and City's motion for summary judgment on Count II are denied. As to Count II, no genuine issue of material fact exists and Willis is entitled to a judgment as to liability as a matter of law.

Those rulings leave open for resolution by trial:

1. all issues bearing on Count I and
2. the issue of damages on Count II,

and there also remains for consideration the effect of *Viens* on the prior rulings in the Opinion. This action is set for a status hearing at 9 a.m. December 22, 1989 to discuss all those remaining matters.

### APPENDIX

Willis originally sued former Chicago Police Superintendent Fred Rice ("Rice") as one of the co-defendants in this action. D.Mem. 1 n. 2 then urged the substitution of Martin for Rice:

> Former Superintendent Fred B. Rice, Sr. was sued in his official capacity in this case. This Court may take judicial notice that the Superintendent of Police for the City of Chicago is now LeRoy Martin. Therefore, pursuant to Fed.R.Civ.P. 25(d)(1), LeRoy Martin is automatically substituted as a party.

Initially P.Ans.Mem. 1 n. 1 rejected that position:

The Defendants assert that because Rice is no longer the Superintendent of Police for the City, LeRoy Martin, the current Superintendent, should be substituted as a party. However, the policy being challenged in this suit was apparently rescinded prior to Rice's resignation and Martin's appointment. *Robinson v. City of Chicago*, 868 F.2d 959, 962 (7th Cir. 1989). In *Heller v. Bushey*, 759 F.2d 1371 (9th Cir.1985), rev'd and remanded on other grounds *sub nom. City of Los Angeles v. Heller*, 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986), the Ninth Circuit ruled with respect to a similar claim that "[t]he proper individual defendants in this action are those officials who were in office before or at the time Plaintiff was arrested and who may have adopted a plan or policy authorizing or approving the unconstitutional conduct." Under this principle, Rice, who was Superintendent at the time of Willis' detention and who was responsible for the Chicago Police Department policies then in effect, remains a proper defendant in this suit.

That view later changed—a change confirmed both by D.R.Mem. 1 n. 1:

> Although plaintiff previously maintained that Fred Rice is still a proper party to this action, defense counsel received a telephone call from plaintiff's counsel on October 12, 1989, in which plaintiff's counsel stated that plaintiff will agree to the substitution of the present Superintendent LeRoy Martin in place of the former Superintendent Fred Rice,

and by Willis' request for summary judgment against Martin rather than Rice in Willis' simultaneously filed P.R.Mem. 13. That moots the contention quoted earlier from P.Ans.Mem. 1 n. 1, and this Court has

---

**20.** City makes a lame attempt to argue it did not have a policy of detaining individuals in the absence of probable cause. That of course is beside the point. What is relevant is that in constitutional terms, *Gerstein* teaches that after the time required for truly administrative processing, a police determination of probable cause simply does not suffice and the arrestee promptly must be brought before a magistrate for such a determination. Paragraph C–2 clearly embodies the official policy sanctioning extended police detention without such a judicial determination, and that suffices for municipal liability under Section 1983.

therefore ordered the automatic substitution of Martin for Rice.