**Ronnie BULLOCK, Sr. and Ronnie Bullock, Jr., Plaintiffs,**

v.

**David DIOGUARDI, Patrick O'Hara, and City of Chicago, Defendants.**

No. 86 C 3819.

United States District Court, N.D. Illinois, E.D.

April 30, 1993.

Ronald Bullock, Sr., Joliet, IL, for plaintiffs.

Kelly Raymond Welsh, Diane J. Larsen, Robert Andrew Dwyer, Jr., Corp. Counsel, Chicago, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Ronnie Bullock, Sr. abducted a nine-year-old girl on her way to school and sexually assaulted her. He was convicted in a 1984 jury trial and is now serving concurrent sentences of fifteen and sixty years. *See People v. Bullock,* 154 Ill.App.3d 266, 107 Ill.Dec. 380, 507. N.E.2d 44 (1987). Following his conviction, Bullock commenced this action against the City of Chicago and the police officers who arrested him. On April 6, 1990, Bullock filed a second amended complaint on behalf of himself and Ronnie Bullock, Jr., the infant son who was with Bullock at the time of his arrest. Alleging violations of their rights under the first, fourth, fifth and fourteenth amendments, the second amended complaint seeks damages and injunctive re-lief. Bullock purports to bring his action under 42 U.S.C. §§ 1981, 1982, 1983, 1985(2) and (3), 1988 and 28 U.S.C. §§ 1331, 1332, and 1343. On June 20, 1990, Judge George M. Marovich, the third judge to be assigned to this case, dismissed Ronnie Jr. with leave to reinstate once Bullock named a guardian for his son. Bullock thereafter filed a motion asking the court to appoint a guardian or counsel for his son and a motion to amend seeking to reinstate his son as a plaintiff. Those motions have yet to be ruled upon. Also pending for decision are a motion to dismiss on behalf of defendant Patrick O'Hara, a motion to dismiss portions of the second amended complaint on behalf of the City of Chicago ("City") and defendant David Dioguardi, the City and Dioguardi's motion for summary judgment, Bullock's motion for partial summary judgment, and various discovery-related motions filed by both parties. The case was assigned to this court on August 25, 1992. The court will now rule on the motions.

### I. Facts [1]

In April 1983, Dioguardi and O'Hara were assigned to investigate the deviate sexual assault of a little girl by a man posing as a police officer. O'Hara took the victim to a police sketch artist who made a composite drawing from the description the girl gave to him. Another police officer who saw the composite drawing noted that it resembled a security guard he had arrested for rape several years earlier. After some further investigation, the officer identified that person as Bullock. Bullock had completed his sentence on the prior offense in 1981. Furnished with this information, Dioguardi went to the home of Bullock's parents on the evening of May 4, 1983. He informed them that he wanted to talk to Bullock about a shooting. Bullock's parents called Bullock and he spoke to Dioguardi. Dioguardi asked Bullock if he would come to his parent's house, but Bullock refused. Bullock then agreed to come in to the

---

1. The facts as set out in this opinion reflect the record in the light most favorable to Bullock. Although neither the second amended complaint, Bullock's Local Rule 12 statement of facts, nor any of the materials that Bullock has submitted in response to defendants' summary judgment motion are verified, the facts as stated in these documents are consistent with the facts in sworn affidavits that Bullock filed in response to City's earlier request for summary judgment. Rec., Doc. Nos. 37 and 39.

police station at 5:00 p.m. the next day and answer questions about the shooting.

Bullock attended court the next morning. He had his infant son with him when he left the courthouse around 11:30 a.m. Dioguardi spotted Bullock as he was leaving the court and arrested him. Refusing Bullock's request to be allowed to take his son home, Dioguardi took Bullock back to the police station located in the courthouse. There he confiscated Bullock's briefcase, wallet, and journals and began interrogating him. Dioguardi denied Bullock's request to contact his lawyer. O'Hara joined Dioguardi about an hour later and advised Bullock of his constitutional rights. They handcuffed Bullock to the wall and continued questioning him over the next six hours. Bullock's repeated requests to call his attorney or contact his family were denied as were his requests for food, water, and access to toilet facilities. According to the allegations of the second amended complaint, the officers delivered food that his parents had brought for him at 8:00 p.m. Bullock further alleges he was at that time allowed to use the bathroom and drink a cup of coffee before being taken back for more questioning. Information Dioguardi and O'Hara elicited from Bullock during the interrogation was introduced into evidence at his trial.

At some point in the afternoon, the police called the victim, and another little girl who similarly had been sexually assaulted by a uniformed man, to arrange for a line up. They scheduled the line up for 7:30 that night at another police station. Dioguardi and O'Hara took Bullock to the police station where both girls identified Bullock as their assailant. Following the identification, Bullock was returned to the police station where he was arrested. Bullock alleges in the second amended complaint that the officers threatened him and used racial slurs while transporting him back and forth between police stations. Dioguardi then investigated an alibi that Bullock proffered before contacting a state's attorney to obtain approval for filing criminal charges against Bullock. Shortly after 11:00 p.m., Bullock was taken to the lock-up where he was booked and fingerprinted. The fingerprints "cleared" at 3:15

a.m. and Bullock was released to the custody of the watch commander on duty at the time. Around noon on May 6, Bullock appeared before a judge for a bond hearing. Unable to make bond, he remained in custody through May 12, 1983 when he appeared for his preliminary hearing at which time a judge made a finding of probable cause.

The first task is to outline the claims that Bullock raises from these facts. This is no easy matter. Although Bullock has divided his second amended complaint into two counts, his "counts" are not counts in the usual sense of separate, easily identifiable claims for relief. Nonetheless, reading the pleading generously as required under *Haines v. Kerner*, 404 U.S. 519, 520–21, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972), the court understands count one of the second amended complaint to be directed at the City of Chicago. Bullock asserts that defendants violated his right to a prompt determination of probable cause before a judicial officer under the fourth and fourteenth amendments and attributes that violation to a City policy that permitted police officers to detain a suspect for a period longer than normally might be expected in order to continue an investigation. Bullock reasserts his extended detention claim in count two, but includes claims against the individual police officers who detained him as well as the City. Both counts could also be read to challenge the legality of his warrantless arrest. Bullock, however, explicitly disclaims any intent to raise a claim of false arrest in this action. Doc. 106, p. 6. The court therefore will give no consideration to the allegations of unlawful arrest contained in the second amended complaint.

In addition to the extended detention claim, count two of the second amended complaint also challenges Bullock's treatment while in police custody. The court understands Bullock to raise four separate claims with respect to the conditions of his post-arrest detention. Bullock alleges that the police defendants (1) failed to inform him of the nature of the charges for which he was arrested; (2) denied him a right to contact an attorney after his arrest; (3) confiscated and subsequently lost certain items of personal

property that were in his possession at the time of his arrest; and (4) used coercive tactics to obtain damaging statements from him. Two issues must be addressed before turning to the substantive merits of the claims Bullock raises in the second amended complaint. Defendant O'Hara was not joined in this action until April 6, 1990 when Bullock amended his complaint for the second time. Claiming this was too late, O'Hara raises a statute of limitations defense to the suit against him. The other procedural matter before the court is Bullock's request to have Ronnie Jr. reinstated in the action.

## II. Statute of Limitations

■ State law determines the statute of limitations for a suit filed under § 1983. *Owens v. Okure*, 488 U.S. 235, 239, 109 S.Ct. 573, 576, 102 L.Ed.2d 594 (1989). The limitations period for a § 1983 suit filed in Illinois is two years. *Farrell v. McDonough*, 966 F.2d 279, 282 (7th Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1059, 122 L.Ed.2d 364 (1993); *Kalimara v. Illinois Department of Corrections*, 879 F.2d 276, 277 (7th Cir.1989). Whether a suit is timely, however, also depends on the pertinent tolling provisions of the forum state's limitations law. *Hardin v. Straub*, 490 U.S. 536, 539, 109 S.Ct. 1998, 2001, 104 L.Ed.2d 582 (1989). Although Illinois no longer tolls the running of the limitations period for its prisoners, at the time Bullock filed his second amended complaint Illinois law treated inmates as persons under a disability entitled to the benefits of its tolling rules, at least with respect to suits that were not directed against the Illinois Department of Corrections or its employees. *Wilson v. Giesen*, 956 F.2d 738, 741 (7th Cir.1992); *see also Dixon v. Chrans*, 986 F.2d 201 (7th Cir.1993) (holding state exception for correctional officials inconsistent with purposes of § 1983). As Bullock joined O'Hara to the action before Illinois amended its statutes to remove prisoners from the class of litigants considered to be under a legal disability, his complaint would appear to be timely.

O'Hara sees it differently. He maintains the tolling of the statute of limitations stopped at the time Bullock first initiated this action. Under this theory, Bullock had

two years to bring O'Hara into the action. O'Hara maintains the suit is untimely as to him because nearly four years had elapsed by the time Bullock got around to naming O'Hara as a defendant in the second amended complaint. The validity of this contention must, of course, be tested against state law.

O'Hara cites one case, *Baird & Warner, Inc. v. Addison Industrial Park, Inc.*, 70 Ill.App.3d 59, 26 Ill.Dec. 1, 387 N.E.2d 831 (1979), to support his argument. But that case has no applicability here. Plaintiff in *Baird* attempted to refile a previously dismissed claim after the statute of limitations had already run. He sought to avoid the limitations bar by arguing that the filing of the initial complaint tolled the running of the limitations period thereby allowing him additional time in which to bring a second suit. The court, however, rejected the notion that a plaintiff could extend the general limitation period by tacking on the time during which a prior suit was pending. 70 Ill.App.3d at 75, 26 Ill.Dec. at 15, 387 N.E.2d at 845.

Unlike the plaintiff in *Baird*, Bullock is not seeking additional time within which to file his claim against O'Hara. State law still considered Bullock to be under a disability when Bullock filed his second amended complaint joining O'Hara to the action. Bullock's situation thus is more akin to that of the plaintiff in *Casillas v. Rosengren*, 86 Ill. App.2d 139, 229 N.E.2d 141 (1967). Plaintiff in that case, a minor, attempted to refile an action several years after her previous lawsuit had been dismissed for want of prosecution. Finding that dismissal for want of prosecution was not an adjudication on the merits, the court remanded the case back to the trial court. The court found that refiling would not run afoul of the statute of limitations because plaintiff was still a minor and therefore still entitled to the benefits of the tolling statute. 86 Ill.App.2d at 143, 229 N.E.2d at 143. Thus, under *Casillas*, the filing of the complaint is of no moment so long as the plaintiff is still under a disability at the time he refiles or, as in this case, seeks to join an additional party to a pending lawsuit.

■ To accept O'Hara's reading of *Baird* would create an illogical anomaly. If, as

O'Hara suggests, the statute of limitations began to run when Bullock first filed his complaint, he would have had only two years to join O'Hara to his suit. But nothing would have stopped Bullock from filing a completely independent action against O'Hara as much as four years after this action was commenced. Bullock was still a prisoner and therefore entitled to the benefits of the state tolling statute in effect at the time. Issues of preclusion would not arise as this case has yet to reach judgment. To say that a plaintiff cannot join a defendant to a ongoing case but may proceed against him by separate action involving the same matters raised in the pending case makes no sense either as a matter of practice or sound judicial administration. *Casillas* permits refiling of a previously dismissed suit within the period of tolling. It necessarily follows that a plaintiff is likewise free to join an additional defendant in a pending action so long as he still enjoys the protection of applicable state tolling rules. Accordingly, finding the suit timely as to O'Hara, the court denies his motion to dismiss.

### III. Ronnie, Jr.

In the second amended complaint, Bullock asserts claims on behalf of his son Ronnie, Jr. who was fifteen-months old at the time of the events at issue in this case. Bullock alleges that police refused to let him take Ronnie Jr. home before submitting to their questioning. He asserts the officers held his son in custody for four hours before releasing him to his mother. The officers allegedly refused to allow Ronnie, Jr. to eat or use the restroom during this time. Bullock maintains that defendants treatment of him frightened his son and complains that O'Hara physically took his son from him at one point and threatened to give him to a matron unless Bullock answered their questions.

Defendants moved to dismiss Ronnie, Jr. from the action arguing, *inter alia*, that a minor could bring claim in a lawsuit only through his or her legal guardian. On June 20, 1990, Judge Marovich granted the motion with leave to reinstate Ronnie, Jr. as a party when Bullock named a guardian for his son.

Bullock thereafter filed a motion asking the court to appoint a guardian for Ronnie, Jr. More recently, he filed a motion to amend seeking to reinstate his son as a plaintiff. For the reasons that follow, those motions are denied.

Capacity to sue is determined by reference to the law of the individual's domicile. Fed.R.Civ.P. 17(b). A minor in Illinois cannot bring suit in his own name. *Severs v. Country Mutual Life Insurance Co.*, 89 Ill.2d 515, 520, 61 Ill.Dec. 137, 139, 434 N.E.2d 290, 292 (1982). Because Ronnie, Jr. cannot bring suit in his own name, he can litigate only through someone acting in a representative capacity. A parent may sue on behalf of his or her minor child as a next friend if the parent is represented by counsel and has no interests that conflict with those of the child. *See In re Chicago, Rock I., & Pac. R.R.*, 788 F.2d 1280, 1282 (7th Cir.1986). Bullock, however, is proceeding without counsel. Although a parent has a right to litigate claims on his own behalf without an attorney, he cannot litigate the claims of his children unless he obtains counsel. *Osei–Afriyie v. Medical College*, 937 F.2d 876, 883 (3d Cir. 1991); *Blue v. People*, 223 Ill.App.3d 594, 596, 165 Ill.Dec. 894, 896, 585 N.E.2d 625, 626 (1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 992, 122 L.Ed.2d 143 (1993). As the court explained in *Cheung v. Youth Orchestra Foundation of Buffalo, Inc.*, 906 F.2d 59 (2d Cir.1990):

> ... The choice to appear *pro se* is not a true choice for minors who under state law, *see* Fed.R.Civ.P. 17(b), cannot determine their own legal actions. There is thus no individual choice to proceed *pro se* for courts to respect, and the sole policy at stake concerns the exclusion of non-licensed persons to appear as attorneys on behalf of others.
>
> It goes without saying that it is not in the interest of minors or incompetents that they be represented by non-attorneys. Where they have claims that require adjudication, they are entitled to trained legal assistance so their rights may be fully protected. There is nothing in the guardian-minor relationship that suggests that the minor's interests would be furthered

by representation by the non-attorney guardian.

*Id.* at 61.

 Because Bullock cannot as a pro se plaintiff bring suit on behalf of his son, the court must deny the motion to amend. The motion to appoint a guardian or counsel to sue on Ronnie, Jr.'s behalf is also denied for lack of sufficient showing of legal need, indigence, or reasonable attempts to obtain assistance of counsel through the private market. *See Farmer v. Haas,* 990 F.2d 319 (7th Cir. 1993). Bullock points to no special circumstances that would require appointment of a guardian ad litem at this time. Because Illinois tolls the statute of limitations for minors, Ill.Rev.Stat. ch. 110, ¶ 13–211 (1991), Ronnie, Jr. will be able to bring suit on his own behalf once he attains the age of majority. Moreover, Bullock submits no information regarding his son's whereabouts or the financial wherewithal of those who presently have actual physical custody of him. That Bullock himself is a pauper does not entitle his son to the free services of a lawyer. As a prisoner, Bullock's ability to support his son financially is obviously limited. Whether his son qualifies for counsel depends on the circumstances of those presently responsible for his care and support.

### IV. Motion to Dismiss

Defendants move to dismiss certain portions of the second amended complaint pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6). They contend the allegations of the complaint do not state a claim for relief under 42 U.S.C. §§ 1981, 1982, 1985(2), 1985(3), 1986, 1988 or 28 U.S.C. § 1331. They further argue that the facts alleged in the second amended complaint do not state a cognizable claim for relief under the first amendment.[2] The City contends that the complaint is insufficient as to it because Bullock fails to allege with specificity that a municipal custom, practice or policy was responsible for depriving him of some constitutional right. Finally, defendants maintain that Bullock's allegations re-

garding the deprivation of his property and denial of his request to talk to an attorney fail to give rise to claims of constitutional significance.

Like many pro se litigants, Bullock attempts to bolster his core § 1983 action with citations to a host of other statutes without much thought as to whether those additional statutes create a cause of action that is at all related to the facts of his particular case. The court agrees with defendants that the second amended complaint alleges no colorable claims independently cognizable under 28 U.S.C. §§ 1331 and 1332 or 42 U.S.C. §§ 1981, 1982, 1986, or 1988 and dismisses Bullock's claims for relief under those statutes without discussion. Similarly, the court finds no arguable suggestion of a violation of Bullock's first amendment rights and dismisses that claim as insubstantial.

 Bullock does, however, allege a cognizable claim for relief under § 1985(3) and the obstruction of due course of justice clause of § 1985(2). Defendants urge dismissal of these claims on grounds that Bullock fails to allege either the existence of a conspiracy or a discriminatory animus on the part of the conspirators, both of which are required elements § 1985(2) and § 1985(3) claims. To support a finding of racial motivation on defendants' part, Bullock points to his allegations that defendants referred to him as a black bastard when they threatened his life. As for the conspiracy, Bullock explains in his responsive brief that Dioguardi and O'Hara agreed the night they contacted his parents that they would arrest Bullock and hold him at the police station in order to build a case against him. These allegations provide the essential elements for pleading conspiracy. *See Scherer v. Balkema,* 840 F.2d 437, 441–42 (7th Cir.), *cert. denied,* 486 U.S. 1043, 108 S.Ct. 2035, 100 L.Ed.2d 620 (1988). That these facts appear in Bullock's brief rather than in the second amended complaint is of no legal significance. *See Early v. Bankers Life & Casualty Co.,* 959 F.2d 75, 79 (7th Cir.1992). Thus, finding it is not beyond

---

**2.** Defendants make a similar argument with respect to the due process clause of the fifth amendment. Bullock explains, however, that his fifth amendment claim is not based on due pro-

cess but rather on a violation of his right to remain silent. The court thus need not address defendants' request to dismiss the fifth amendment due process claim.

**562**

doubt that Bullock can prove no set of facts in support of his claim of a racially-motivated conspiracy, the court denies the defendants' motion to dismiss the claims under §§ 1985(2) and (3).[3]

 Defendants also move to dismiss Bullock's claims regarding the confiscation of his wallet, briefcase, and journal and the subsequent loss or theft of the briefcase. Bullock alleges the items were taken from him upon his arrest. This seizure did not violate Bullock's constitutional rights. As explained in *Chambers v. Maher*, 915 F.2d 1141 (7th Cir.1990), *cert. denied*, 499 U.S. 910, 111 S.Ct. 1116, 113 L.Ed.2d 225 (1991):

> It is well established that the police can seize and search the personal effects of a person under lawful arrest as part of the routine administrative procedure at a police station. These inventory searches do not rest on the concept of probable cause; rather, they are based on interests such as removing potentially dangerous instrumentalities from an arrestee and deterring an arrestee from making false claims regarding theft of property.

*Id.* at 1143. The court therefore dismisses Bullock's deprivation of property claim as it relates to the initial seizure upon arrest.

 The court also dismisses Bullock's claim regarding the theft of his briefcase, but for different reasons. While the initial seizure of Bullock's property is analyzed under the fourth amendment, the alleged theft of the briefcase falls under the fourteenth. The question is whether the property was taken without due process of law. An adequate state postdeprivation remedy is all that due process requires to protect against a wrongful deprivation of property occasioned by the random and unauthorized intentional act of a public official. *Hudson v. Palmer*, 468 U.S. 517, 533, 104 S.Ct. 3194, 3203, 82 L.Ed.2d 393 (1984). Assuming defendants were responsible for the theft, as

Bullock alleges, their act certainly was random and unauthorized. Furthermore, Bullock had an adequate state remedy for his claim. Illinois recognizes the common law tort of conversion and has applied it to hold local officials liable for a wrongful taking of property. *See Heimberger v. Village of Chebanse*, 124 Ill.App.3d 310, 79 Ill.Dec. 593, 463 N.E.2d 1368 (1984). Bullock thus could have sued for damages in state court. Because the state provided him with an adequate postdeprivation remedy, Bullock cannot hold defendants liable for depriving him of his property without due process. *See Greco v. Guss*, 775 F.2d 161, 169 (7th Cir.1985); *Slaughter v. Anderson*, 673 F.Supp. 929, 930 (N.D.Ill.1987). Accordingly, Bullock's claims contesting the taking of his personal property are dismissed.

 Bullock raises two further claims with respect to his treatment upon arrest that defendants ask to have dismissed. Bullock alleges defendants violated his rights by not allowing him to make a telephone call to contact his attorney or family and by misinforming of the reasons for his arrest. The sixth amendment right to an attorney, and the auxiliary right to make a phone call to obtain legal assistance, does not attach until "at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information or arraignment." *Kirby v. Illinois*, 406 U.S. 682, 684, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972). Bullock's primary grievance is that police held him too long without taking the steps necessary to formally initiate criminal proceedings against him. Because the right to counsel had not yet attached during the time he was in the custody of the defendant police officers, he cannot complain that their denial of his request for a phone call to contact an attorney or family members violated his constitutional rights. *See Rodgers v. Lincoln Towing Ser-*

---

**3.** While Bullock may allege a viable § 1985 conspiracy, the utility of such a claim here is questionable. As Judge Posner noted in *Niehus v. Liberio*, 973 F.2d 526, 532 (7th Cir.1992), the primary purpose of pursuing a civil conspiracy claim in a case like this is to spread the net of liability to co-conspirators who were not involved in the actual deprivation of plaintiff's rights. Because defendants here are alleged to have directly participated in the violation of Bullock's constitutional rights, the conspiracy charges do little more than add to the complexity of the case and Bullock's burden in proving the existence of a conspiratorial agreement motivated by race.

*vice,* 771 F.2d 194, 199 (7th Cir.1985); *State Bank of St. Charles v. Camic,* 712 F.2d 1140, 1145 n. 2 (7th Cir.), *cert. denied,* 464 U.S. 995, 104 S.Ct. 491, 78 L.Ed.2d 686 (1983).

 Bullock's complaint that defendants lied to him about the nature of the charges against him meets a similar fate. Because the right of an accused to be informed of the nature and cause of the accusation against him also stems from the sixth amendment, it does not come into play until the government formally commences prosecution. Because police officers are under no constitutional obligation to inform a suspect of the charges against him at the time they make their arrest, *Kladis v. Brezek,* 823 F.2d 1014, 1018 (7th Cir.1987), Bullock cannot hold defendants liable for not disclosing the true reasons for his arrest when they first took him into custody.

The City seeks dismissal from the lawsuit on the contention that Bullock failed to allege with specificity the existence of a municipal policy, practice or custom. The line of cases in this circuit requiring a plaintiff to plead the existence of a municipal policy with particular specificity appear to now be dead in light of *Leatherman v. Tarrant County Narcotics Unit,* —— U.S. ——, ——, 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517 (1993). But even under pre-*Leatherman* standards, Bullock's municipal policy allegations suffice to survive a motion to dismiss. To quote Judge Marovich's earlier opinion in this case:

> The City's argument that Bullock does not allege a sufficient policy on its part can be dispatched with ease. Bullock clearly cites General Order 78–1 as the policy that caused his extended detention. This policy, now apparently rescinded, has been held to violate the Fourth Amendment. *Willis v. Bell,* [726 F.Supp. 1118 (N.D.Ill. 1989)]; *Robinson v. City of Chicago,* 638 F.Supp. 186, 191–93 (N.D.Ill.1986), *rev'd on other grounds,* 868 F.2d 959 (7th Cir. 1989). The only question that remains is

whether Bullock was detained pursuant to the policy and, if so, did the detention violate the Fourth Amendment under the circumstances of this case.

Accordingly, the motion to dismiss the City is denied.

In summary, the court grants defendants' motion to dismiss and dismisses all claims save Bullock's claims under 42 U.S.C. §§ 1983, 1985(2), and 1985(3) that Dioguardi and O'Hara used coercive tactics to obtain statements from him in violation of the fourth, fifth, and fourteenth amendments and detained him without a prompt determination of probable cause by a judicial officer in violation of the fourth amendment and that the City sanctioned the violation by its explicit policy permitting extended detentions.

## V. Motion for Summary Judgment[4]

 Defendants' summary judgment motion addresses only one of the remaining claims in this suit, Bullock's fourth amendment extended detention claim. On a motion for summary judgment, the entire record is considered and all reasonable inferences drawn from it are viewed in the light most favorable to the party opposing summary judgment. *Lohorn v. Michal,* 913 F.2d 327, 331 (7th Cir.1990). The party seeking summary judgment has the initial burden of establishing a lack of any genuine issue of fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once the moving party has discharged its burden, the nonmoving party with respect to those issues upon which he bears the burden of proof at trial, must set forth facts through affidavits or other evidentiary materials establishing the existence of a genuine issue for trial. *Selan v. Kiley,* 969 F.2d 560, 564 (7th Cir.1992). A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106

---

4. Bullock's brief in response to defendants' summary judgment motion is captioned to include a motion for partial summary judgment in his favor. The body of the document, however, includes no such request for relief. In the past the court would simply have ignored the mislabeling. Now, however, such "motions" are entered as

such on the computerized docketing system and show up as pending on reports generated to assist the court in tracking its cases. Therefore, the court will deny Bullock's partial motion for summary judgment in order to clarify the court's own records.

**564**

S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The court finds that Bullock has succeeded in demonstrating the existence of sufficient evidence to support a verdict in his favor.

## A. City

■ Because the facts that are significant to Bullock's claim against the City differ from those that are material to his claim against the individual defendants, the court will consider the motion as it relates to each set of defendants separately. Bullock's claim against the City is premised primarily upon the Chicago Police Department's General Order 78–1, § 6, ¶ 2, which explicitly authorizes investigative officers to make a request to a superior to keep an arrestee under detention for "a period of time longer than that which might routinely be expected." Several judges of this court have held this extended detention policy to be facially unconstitutional under the holding of *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). *Willis*, 726 F.Supp. at 1125; *Robinson*, 638 F.Supp. at 191–93; *see Bostic v. City of Chicago*, 1991 WL 96430, *6 n. 1, 1991 U.S.Dist. LEXIS 7345, *9 n. 1 (May 21, 1991), *aff'd on other grounds*, 981 F.2d 965 (7th Cir.1992). *Gerstein* held that one taken into custody without a warrant had a fourth amendment right to "a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest." *Id.* 420 U.S. at 114, 95 S.Ct. at 863. Following *Gerstein*, courts have permitted those arrested without warrant to bring suit against police who detained them for unreasonable amounts of time without taking them before a judicial officer for a probable cause hearing. Whether the length of a particular detention between arrest and a probable cause hearing exceeds constitutional limits is determined by the reasonableness standard that courts generally use to judge claims arising under the fourth amendment. *See Moore v. Marketplace Restaurant, Inc.*, 754 F.2d 1336, 1351 (7th Cir.1985). In denying the City's motion for summary judgment on Bullock's first amended complaint, Judge Marovich, applying the prevailing fourth amendment standard, concluded that there was room for a difference of opinion as to whether Bullock's pre-hearing detention was reasonable under the circumstances. The City here reiterates many of the same arguments that Judge Marovich earlier rejected. The court sees no need to revisit those contentions.

One significant event since Judge Marovich's last opinion in this case does require comment—the Supreme Court's decision in *County of Riverside v. McLaughlin*, 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991). *McLaughlin* undertook the task of defining what was "prompt" within the meaning of *Gerstein*. Remarking that the *Gerstein* requirement of a prompt determination of probable cause following a warrantless arrest had resulted in a plethora of systemic challenges to city and county practices, the Court recognized the need "to articulate more clearly the boundaries of what is permissible under the Fourth Amendment." *Id.* 500 U.S. at ——, 111 S.Ct. at 1670. Weighing competing interests of the individual against the administrative needs of local authorities in processing those arrested, the Court created a presumption that a jurisdiction which provided probable cause determinations within 48 hours of arrest would be exempt from having its post-arrest procedures subject to fourth amendment scrutiny in a systemic challenge. *Id.* If a suspect arrested without warrant was not given a probable cause hearing within 48 hours, however, "the burden shifts to the government to demonstrate the existence of a bona fide emergency or other extraordinary circumstance." *Id.*

■ Asserting that Bullock was provided with a probable cause determination within 34 hours of his arrest, the City maintains that the length of his pre-hearing detention was presumptively reasonable under *McLaughlin*. The problem with this argument is that it finds no factual support in the record. According to the record as it now stands, Bullock appeared for a bond hearing slightly more than twenty-four hours after his initial arrest. Defendants provide no evidence to show that the judicial officer conducting the bond hearing made a finding of probable cause. Although Bullock did eventually receive a preliminary hearing to establish probable cause, that hearing did not take place until May 12, a week after Bullock's arrest. Therefore, under the *McLaughlin*

presumptions, the length of Bullock's detention without a determination of probable cause was constitutionally unreasonable. The burden remains with the City to come forward with evidence justifying the seven-day delay. It has not done so.

Of course the mere fact of the delay is not itself enough to establish liability on the part of the City. Bullock must still link the delay to some City policy or custom. Although Bullock argues that the delay in his case was occasioned by the City's policy of extended detention as expressed in General Order 78–1, he provides scant evidence to support a finding that his custody was actually continued pursuant to General Order 78–1. Nonetheless, following *Sivard v. Pulaski County,* 959 F.2d 662 (7th Cir.1992), the court concludes that he has made a sufficient showing of policy to preclude summary judgment at this time.

In *Sivard,* the plaintiff was arrested for battery and held for seventeen days before being charged before a judicial officer. He alleged that his wrongful detention was the result of a custom and practice of the county. The county filed a motion for summary judgment to which plaintiff did not respond. Although the court noted that plaintiff's allegations of policy approached "the level of boilerplate vagueness," it concluded that the summary dismissal of the claim against the county was unwarranted in light of the undisputed fact that the county had detained plaintiff well beyond the 48–hour guideline of *McLaughlin* and the county's failure to proffer any reasonable explanation for the delay. *Id.* at 668–69. The court concluded in noting that:

> summary judgment is a carrot to encourage the prompt resolution of meritless cases, not a stick to punish a plaintiff for not conducting discovery when the factual basis for his cause of action is admitted by the defendants. Mr. Sivard must develop more facts to prevail, but he should be allowed to proceed.

*Id.* at 669.

Like the defendant in *Sivard,* the City has proffered no explanation for its delay in processing Bullock. Unlike plaintiff in *Sivard,* Bullock is proceeding without the benefit of

counsel. Moreover, it appears from a motion to compel that Bullock has pending, that he also has attempted to conduct discovery to obtain proof to support his policy claim. The status of his discovery requests is unclear. It appears that defendants have postponed response pending ruling on their dispositive motions. In any event, it would be premature at this time for the court to conclude that Bullock has no evidence to support his claim that the City's policy was the cause of his extended detention.

The City also argues that Bullock's claim should be dismissed because he suffered no actual damages. It reasons that because a court eventually found probable cause and because Bullock could not make bond, he suffered no cognizable loss of liberty as a result of his pre-hearing detention. This argument, however, presumes that Bullock's claim arises under the due process clause of the fourteenth amendment. It does not. The right to a prompt judicial determination of probable cause as a prerequisite to an extended detention following a warrantless arrest arises under the fourth amendment as applied to the states by the fourteenth amendment. *See McLaughlin,* 500 U.S. at 46, 111 S.Ct. at 1665. The issue is whether "the detention is reasonable in light of all the circumstances accompanying the detainee's arrest." *Patrick v. Jasper County,* 901 F.2d 561, 567 (7th Cir.1990). To accept the City's position would render nugatory the substantive fourth amendment rights of those too poor to post bond. The reasonableness of one's post-arrest detention should not turn on one's ability to pay. Nor does the protection of the fourth amendment extend only to those who are innocent. Unreasonable delay includes delay "for the purpose of gathering additional evidence to justify the arrest." *McLaughlin,* 500 U.S. at 56, 111 S.Ct. at 1670. It makes little sense to say that the fourth amendment forbids a police officer from holding a suspect in prolonged custody solely to build a case against him and then allow him to escape liability on the grounds that a court subsequently found probable cause on the basis of evidence that was the fruit of the illegal detention. That Bullock would have remained in custody re-

**566**

gardless of the timing of the probable cause hearing therefore does not defeat his fourth amendment claim.[5]

■ The City is entitled to summary judgment on Bullock's claim for injunctive and declaratory relief. First, the claims for equitable relief appear to be moot as the policy that Bullock challenges has since been rescinded. Moreover, *Robinson v. City of Chicago*, 868 F.2d 959 (7th Cir.1989), *cert. denied*, 493 U.S. 1035, 110 S.Ct. 756, 107 L.Ed.2d 773 (1990) compels a finding that plaintiff lacks standing to assert his claims for equitable relief. To establish standing, plaintiff must show more than past exposure to illegal conduct, he must show that he is in immediate danger of sustaining direct injury. The possibility that Bullock will again encounter police and be illegally detained is too speculative to give him standing to litigate his claims for equitable relief. Accordingly, the court grants defendants' motion for summary judgment as to those claims.

### B. Dioguardi and O'Hara[6]

■ The facts as they apply to the individual police officers requires a different analysis than that used to judge the adequacy of Bullock's claim against the City. The individual officers disclaim any responsibility for Bullock's custody following the time of his delivery to the watch commander, some sixteen hours after his arrest. Of course, if defendants had asked the watch commander to extend Bullock's detention to continue their investigation as authorized under General Order 78–1, then they would also be responsible for any delay prompted by the decision to hold Bullock beyond the time he normally would have appeared for a judicial determination of probable cause. But in any event, it is doubtful that the record could support a finding that defendants were responsible for holding Bullock beyond the 48–hour period considered presumptively permissible under *McLaughlin*. The question then is whether the facts are sufficient to

allow a jury to overcome the presumption of reasonableness that attends a detention of less than 48 hours.

■ As this court noted in *Arnold v. City of Chicago*, 776 F.Supp. 1259, 1264 (N.D.Ill. 1991), *McLaughlin* clearly allows a plaintiff to present facts to rebut the presumptive reasonableness of providing a probable cause hearing within 48 hours of arrest.

[A hearing provided within 48 hours] may nonetheless violate *Gerstein* if the arrested individual can prove that his or her probable cause determination was delayed unreasonably. Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake.

*McLaughlin*, 500 U.S. at 45, 111 S.Ct. at 1664. Defendants state that the delay in processing Bullock was primarily attributable to the need to contact the victim to arrange a lineup and to investigate an alibi defense that Bullock provided. Relying on *Arnold*, they maintain that arranging a lineup is a permissible step incident to arrest and therefore just cause for delaying a judicial determination of probable cause.

If defendants did nothing more than detain Bullock to arrange for identification lineup, then they would, as this court held in *Arnold*, be entitled to summary judgment. But the facts here lend themselves to a different interpretation. The heart of Bullock's case is that the police officers detained him for interrogation in order to elicit information solely for the purpose of building a case against him. *McLaughlin* considers such delays to be unreasonable whether or not the suspect is given a probable cause hearing within 48 hours of arrest.

There are several facts that Bullock cites that could support an inference of improper purpose on the part of defendants and that distinguish this case from *Arnold*. In *Arnold*, the prosecutor approved the filing of felony charges shortly after the plaintiff's

---

**5.** Defendants' "no harm, no foul" defense is also insufficient to defeat a due process claim. *See Willis*, 726 F.Supp. at 1126.

**6.** Although the summary judgment motion as to the individual officers makes reference only to Dioguardi, O'Hara asked to join in the motion in the event the court denied his separate motion to dismiss.

1:00 a.m. arrest. Police booked and processed the suspect before taking him to the lineup. Although police checked out evidence they recovered during an inventory search of plaintiff's vehicle, there were no allegations that they continued to question the subject while waiting for the lineup. Based on the evidence in that case, the court could find no basis for concluding that "police extended Arnold's detention to conduct a fishing expedition." 776 F.Supp. at 1265.

A jury, however, could reach such a conclusion from the evidence in this case. According to Bullock, defendants subjected him to six hours of grueling and psychologically coercive interrogation following his mid-morning arrest just outside the courthouse. Although defendants made arrangements to conduct a lineup shortly after the arrest, they did not contact a prosecutor to obtain approval for criminal charges until after the victim had identified plaintiff in the lineup. Nor did they make any attempt to book Bullock until nearly twelve hours after his arrest. These unexplained delays, coupled with the intense questioning of Bullock, could be read to support a finding that defendants postponed bringing Bullock before a judicial officer for a probable cause determination primarily for the purpose of building a case against him. Defendants therefore are not entitled to summary judgment.

Defendants also advance a qualified immunity defense. Defendants are entitled to qualified immunity only if "a reasonable official, confronted with the specific facts at issue, and the law in·effect at the time, would have known that his conduct violated the plaintiff's constitutional rights." *Schertz v. Waupaca County*, 875 F.2d 578, 583 (7th Cir.1989). Defendants assert that they acted properly at all times and did not violate any clearly established right. *Gerstein* itself, however, defeats defendants' claim to a qualified immunity defense. As the Court there noted, "[i]t is not the function of the police to arrest, as it were, at large and to use the interrogating process at police headquarters in order to determine whom they should charge before a committing magistrate on 'probable cause.'" 420 U.S. at 120 n. 21, 95 S.Ct. at 866 n. 21 (quoting *Mallory v. United*

*States*, 354 U.S. 449, 456, 77 S.Ct. 1356, 1360, 1 L.Ed.2d 1479 (1957). *McLaughlin* clarified but did not alter prior law. Even in 1983, when the events in this case took place, a reasonable police officer would have known that it was unlawful to arrest and detain a suspect for lengthy interrogation in order to solidify chances that a court at some later date would find probable cause.

## VI. Conclusion

In conclusion, the court denies defendant O'Hara's motion to dismiss. The remaining defendants' motion to dismiss is granted in all respects except Bullock's claims under 42 U.S.C. §§ 1983, 1985(2), and 1985(3) that Dioguardi and O'Hara used coercive tactics to obtain statements from him in violation of the fourth, fifth, and fourteenth amendments and detained him without a prompt determination of probable cause by a judicial officer in violation of the fourth amendment and his claim that the City sanctioned the violation by its explicit policy permitting extended detentions. The court denies Bullock's motion to appoint a guardian and motion to amend. Defendants' motion for summary judgment is granted as to Bullock's request for equitable relief and denied in all other respects. The court denies Bullock's motion for partial summary judgment and all outstanding discovery motions. Defendants are given 30 days to respond to Bullock's outstanding discovery requests. It is so ordered.