Donald SMITH and Walter Lundeen, Jr. on their own behalf and on behalf of all others similarly situated, Plaintiffs–Appellants,

v.

WISCONSIN DEPARTMENT OF AGRICULTURE, TRADE AND CONSUMER PROTECTION; Howard C. Richards; Alan T. Tracy; Helene Nelson; William D. Mathias; William J. Hansen; Byron Dennison; Gary Bauer; Steven Steinhoff; C. Thomas Leitzke; Raymond Cress; Jon Dresser; Robert Thiele; Brian Moyer; and Doe's A through Z, being other employees of the Department presently unknown, Defendants–Appellees.

No. 93–2423.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 3, 1994.

Decided May 2, 1994.

Matthew A. Biegert (argued), Thomas Bell, Doar, Drill & Skow, New Richmond, WI, for plaintiffs-appellants.

Paul L. Barnett (argued), Office of the Atty. Gen., Wisconsin Dept. of Justice, Madison, WI, for defendants-appellees.

Before CUMMINGS and CUDAHY, Circuit Judges, and ROSZKOWSKI, District Judge.[*]

CUDAHY, Circuit Judge.

Though it is reported that California has recently surpassed Wisconsin as the nation's largest producer of milk and milk products, *see* Scott Pendleton, *Dairy Industry Moves Southwest Seeking Warmer, Drier Climate,* Christian Science Monitor, Jan. 21, 1994, at 10, Wisconsin dairy farming is nonetheless very big business.[1] There are about 24,000 Grade A dairy farms in the state, and Wisconsin's dairy industry is a multi-billion dollar enterprise. Assuring the safety and purity of the state's milk products is therefore an important state priority. Wisconsin dairy farmers are as a result subject to an extensive set of state health and safety regulations. But the regulation of milk safety is more than just a matter of state law. The regulatory regime involves a complicated patchwork of overlapping state and federal oversight. This case presents a constitutional challenge to the regime for regulating milk safety in Wisconsin.

## I. The regulatory framework.

All food shipped in interstate commerce is regulated by the Food and Drug Administration ("FDA"), 21 U.S.C. § 301 *et seq.,* though

---

[*] The Honorable Stanley J. Roszkowski, of the United States District Court for the Northern District of Illinois, is sitting by designation.

1. Wisconsin people are proud to bear the appellation, "cheeseheads," applied to them by some denizens of less enlightened and vitamin-enriched jurisdictions.

the FDA has in part delegated the responsibility for regulating milk safety to the National Conference on Interstate Milk Shipments ("NCIMS"), a voluntary cooperative of state regulatory agencies in which every state (Wisconsin included) and every U.S. Territory participates.

The FDA publishes standards for Grade A milk and dairy farm sanitation in the form of a model ordinance: the Grade A Pasteurized Milk Ordinance ("PMO"). The PMO, first published in 1924 and now in its fifteenth revision, spells out the basic standards that dairies must meet to produce Grade A milk.[2] The NCIMS is the governing body for state regulatory agencies that implement the PMO. Its executive board contains members from state health and agricultural departments, as well as from the FDA, the U.S. Department of Agriculture and the milk industry. The NCIMS must approve all changes to the PMO, though the FDA has veto power over any proposed changes.

The NCIMS requires that state law comply with the PMO, and Wisconsin statutory law accordingly requires that the milk safety administrative regulations promulgated by the Wisconsin Department of Agriculture, Trade and Consumer Protection ("DATCP") be in accordance with the PMO. Wis.Stat. § 97.24(3).

In addition, the FDA has adopted the PMO as a statement of the minimum requirements that a state regulatory and enforcement program must meet in order for the state to be certified, and the FDA inspects, and can decertify, state regulatory programs that fail to satisfy this standard. The effect of decertification would be to forbid milk from the decertified state from being introduced in interstate commerce.

## II. Wisconsin's regulatory regime.

Wisconsin's milk safety regulations were, until August 1, 1989, contained in Wis.Ad-

min.Code § Ag 80. Those regulations employed a "double debit" suspension procedure. Under these procedures, an inspector would visit each Grade A dairy farm at least twice a year. Where an "imminent health hazard" existed, the DATCP could temporarily suspend a Grade A permit without notice or a hearing. Wis.Admin.Code § Ag 80.17(3).[3] Otherwise, Wis.Admin.Code § Ag 80.04(1) directed an inspector who found a violation of the dairy farm standard to provide the farmer with written notice of the violation. No adverse consequences would flow from this first finding of a violation. The farmer was simply directed to correct the violation, and it is only if she failed to do so by the next inspection (which was typically held within the next six months), that the farmer's Grade A permit would be suspended.[4] Wis.Admin.Code § Ag 80.04. But even though a farmer was not penalized by a first finding of a violation (assuming that it was corrected), she could nonetheless obtain a hearing on the inspection's findings within twenty days.

By the same token, if on reinspection the DATCP inspector found that a previously noted violation had not been corrected (and therefore suspended the farmer's Grade A permit), the farmer again had an opportunity to seek a hearing (available within twenty days) on the inspector's findings. Wis.Admin.Code § Ag 80.07(24)(e). But relatively few farmers endured the trouble and expense of a hearing, since a farmer could instead simply correct the alleged violation and request reinstatement within a few hours or days after the suspension. Although thousands of Grade A dairy permits were suspended between 1985 and 1989, fewer than ten dairy farmers requested hearings to challenge their suspensions.

Between 1987 and 1989, a number of Wisconsin state courts found this double debit

---

**2.** Grade A milk is fit for human consumption in liquid form, while Grade B milk is fit for human consumption only as butter, cheese, and other dairy products not consumed in liquid form. Grade C milk is contaminated, and not fit for human consumption in any form. *See* David L. Baumer, *Federal Regulation of Milk Production and Sale is Growing at the Expense of State Authority,* 12 J.Agric.Tax'n & L. 36, 38–39 (1990).

**3.** Wis.Admin.Code § Ag 80.17(3) remains in effect, and no one here challenges the constitutionality of this procedure.

**4.** The farmer was still permitted, on the suspension of a Grade A permit, to sell the milk as Grade B.

suspension procedure to violate two separate provisions of Wisconsin law. Section 97.-12(3)(b) of the Wisconsin Statutes limits DATCP's authority to suspend a farmer's license or permit without notice or hearing to situations where "continuation of the violation constitutes a serious danger to public health." Additionally, Section 227.51 of the Wisconsin Statutes, which governs state administrative law more generally, indicates that except in cases where "public health, safety or welfare imperatively requires emergency action," no state agency can suspend a license unless the agency provides the licensee "an opportunity to show" that he is in compliance with the relevant regulations. The double debit procedure of Wis.Admin.Code § Ag 80.04(1) allowed DATCP to suspend a dairy farmer's Grade A permit, arguably without providing an opportunity to be heard,[5] in circumstances where the alleged violation did not pose any threat to public health. On that basis three Wisconsin state courts apparently found the regulatory regime to violate the statutory requirements.[6]

In response to these decisions, the state undertook to revamp its regulatory procedures. But it had only so much leeway to do so, because whatever regulatory mechanism it set up was required to comply with the PMO. This posed something of a dilemma, because the PMO requires the *immediate* suspension of a Grade A permit by an inspector whenever a repeat violation is discovered.[7] It therefore drafted § Ag 60 of the Wisconsin Administrative Code, which formally went into effect on August 1, 1989, though it apparently had been enforced informally as early as July 1988.

Under § Ag 60, dairy farms continued to be inspected at least twice annually. Where a "key violation" is found,[8] the farmer receives a notice that if the problem is not corrected by a specified date, the Grade A permit will be suspended. It also informs the farmer of her right to a hearing.

If, on reinspection, the key violation is not corrected, the farmer's permit is suspended. The notice of suspension also provides the producer with notice that he is entitled to a hearing on the suspension. As for "key vio-

---

**5.** The "argument" here is whether the availability of a hearing on the first finding of a violation provides sufficient opportunity to be heard. Whether this regime satisfies the requirements of the Due Process Clause turns on the same question, and is discussed *infra* at pages 1142–44.

**6.** We say "apparently" because we have been unable to find published opinions in any of the three Wisconsin state cases to which the parties refer in their briefs. The plaintiffs suggest (incorrectly, as far as we have been able to tell) that these opinions are part of the record on appeal. But the state admitted in oral argument that the Wisconsin courts have so held. Because the only issue before us is the permissibility of the state regulatory regime under the federal constitution, our discussion of the evolution of the state law is only by way of background, and we need not inquire further into the state court decisions that led DATCP to enact the regulations that are here being challenged.

**7.** It is actually less than clear to us that the language of the PMO requires immediate suspension (before a hearing can be held). Section 3 of the PMO says that the "regulatory agency shall suspend a permit ... whenever the permit holder has violated any of the requirements of this Ordinance," while Section 5 says that "except for [ ] emergencies, no penalty is imposed on the producer ... upon the first violation." But the FDA has interpreted this to mean that a permit

needs to be *immediately* suspended on a finding of a second violation. The FDA therefore informed DATCP that a proposed procedure under which DATCP, before suspending the license, would allow a farmer to seek a hearing after the second inspection would violate the PMO. R.O.A. 32, Letter from Jerome Kozak (FDA) to Steven B. Steinhoff (DATCP) of Feb. 10, 1988.

This puts DATCP in a bind. State law says that it must follow the PMO. Wis.Stat. § 97.-24(3). The PMO says that repeat offenders need to be suspended immediately. But separate provisions of state law also say that it cannot suspend a permit without first providing notice and a hearing. Wis.Stat. §§ 97.12(3)(b) & 227.51. But insofar as this is a quandary, it is wholly a creation of conflicting provisions of Wisconsin law, and the job of cutting this Gordian knot therefore falls on the state's courts and legislature.

**8.** Key violations are defined in Wis.Admin.Code § Ag 60.01(15), and include a violation that creates a "substantial risk of milk adulteration," even if it does not constitute "an imminent health hazard." Enumerated examples include "[f]ilthy conditions in a cowyard, resulting in very dirty cows," "[v]isibly dirty udders" on the cows being milked, "[r]odent activity in the milkhouse," and "[d]ead animals in the milking barn or cowyard."

lations," then, the revised § Ag 60 was no different than its predecessor, § Ag 80. But because the administrative code defines any repeat violation as a "key violation," for infractions that are not otherwise "key violations" § Ag 60 essentially replaces § Ag 80's "double debit" procedure with a "triple debit" rule.[9]

### III. Smith's and Lundeen's challenges.

Donald Smith is a retired Wisconsin dairy farmer, who formerly operated a dairy farm near Merrill, Wisconsin. He brought this action against DATCP and a number of its officials in a Wisconsin state court, claiming that his constitutional rights under the due process clause were violated by the enforcement of the former regulatory regime set out in § Ag 80. While still in state court, the complaint was amended to add Walter Lundeen, Jr. as a plaintiff. Lundeen is currently a Wisconsin dairy farmer, who operates a farm in Frederic, Wisconsin. Though he had not yet had his permit suspended under the new regulatory framework, he contended that the procedures set out under Wis.Admin.Code § Ag 60 violate his due process rights, and asked that the court enjoin their enforcement.

DATCP then brought a third-party complaint seeking indemnification against the United States, the FDA and six FDA milk safety officers, on the theory that, if it had violated the plaintiffs' due process rights, it was only because it was required to do so in order to comply with the PMO and retain its FDA certification. The United States removed the case to the federal district court, where DATCP soon thereafter voluntarily dismissed the third party complaint against the United States, the FDA and its officers. The district court then certified a class of farmers, represented by Smith, who have had their Grade A permits suspended pursuant to Wis.Admin.Code § Ag 80.

The district court granted summary judgment in favor of the defendants. It found that Lundeen lacked standing, and therefore

could not bring a claim in federal court. As for Smith's claim, the court found that DATCP was entitled to Eleventh Amendment sovereign immunity, and that the court therefore could not retain jurisdiction over the suit against the state agency.

That left only Smith's complaint against the DATCP officers. The court found that the test for determining whether Wisconsin's procedure for enforcing its milk safety laws violates due process turns on the application of the *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), balancing test. But the court never decided which way the scales tipped. Rather, satisfied that the officers had not violated any "clearly established" constitutional right, the court dismissed the complaint against the officers on qualified immunity grounds. Both plaintiffs appeal.

### IV. DATCP's sovereign immunity.

 Smith, who is retired, claims the enforcement of § Ag 80 violated his constitutional rights, and seeks damages. We first take up the question of DATCP's sovereign immunity with respect to Smith's claim. This is an easy question. DATCP is a state agency. It therefore has sovereign immunity, and Smith cannot recover damages against it in federal court. *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). Smith concedes this much, disputing only the consequences of this determination.

The district court, after finding that DATCP had sovereign immunity, dismissed the complaint against it. Smith, insisting that the doctrine of sovereign immunity limits the subject matter jurisdiction of the federal courts, says that the action should have been remanded to state court (where it was filed), rather than dismissed. For this proposition he cites to 28 U.S.C. § 1447(c), which says that if "at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."

---

9. It is not clear to us that this "triple debit" rule remedies the problems that the Wisconsin courts had with § 80's "double debit" procedure. But this is not surprising, given the difficult task that

state law imposes on DATCP. *See* note 7. Counsel informed us during oral argument that § 60 is separately being challenged on state statutory grounds *in state court.*

■ DATCP responds to this straightforward argument by contending that there is no point in remanding the case, since the state court, as a matter of state law (particularly the state's doctrine of sovereign immunity), would have in any event dismissed the claims against the state agency. But the Supreme Court has squarely rejected the argument that there is an implicit "futility exception" hidden behind the plain meaning of § 1447(c). *See International Primate Protection League v. Administrators of Tulane Educational Fund,* 500 U.S. 72, 111 S.Ct. 1700, 114 L.Ed.2d 134 (1991). Just as in *Primate Protection League,* whether a Wisconsin court would entertain Smith's suit against DATCP "turns on a question of [Wisconsin] law, and we decline to speculate on the proper result." *Id. See also Maine Ass'n of Interdependent Neighborhoods v. Commissioner, Maine Dept. of Human Services,* 876 F.2d 1051, 1055 (1st Cir.1989) ("But the fact that we believe a certain legal result *unlikely,* as a matter of state law, is not sufficient grounds for reading an exception into the absolute statutory words 'shall be remanded.'") (emphasis in original).[10]

If the district court lacked subject-matter jurisdiction over Smith's claim against DATCP, it is clear that his claim should have been remanded to the Wisconsin state court. The remaining question, then, is whether Smith is correct in asserting that DATCP's sovereign immunity deprived the district court of subject-matter jurisdiction over the claim against it.

Answering this question requires us to examine the extent to which Eleventh Amendment sovereign immunity limits the subject-matter jurisdiction of the federal courts. The traditional argument, which Smith implicitly advances, is that sovereign immunity does limit the subject-matter jurisdiction of the federal courts, precluding them from hearing any suit against a state government. On this view, the principle "of sovereign immunity is a constitutional limitation on the federal judicial power established in Art. III." *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 98, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984).

It has been frequently observed that it is hard to square this traditional view with the language of either Article III or the Eleventh Amendment. The Eleventh Amendment, after all, says only that the "Judicial power of the United States shall not be construed to extend to any suit ... prosecuted against one of the United States by Citizens of another State." But in *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), the Supreme Court announced that citizens of a state may not prosecute a suit against their own state in federal court.

There is a lively debate in judicial and academic circles about the proper interpretation of *Hans.* Some contend that *Hans* means only that where individual citizens are suing their own state, federal courts will recognize a common law immunity from suit. But this is simply a defense on the merits (like absolute or qualified immunity), not a jurisdictional bar. On this view, the "Court in *Hans* was not using the Eleventh Amendment as a jurisdictional bar, but was stating only the unchanged principle of common law immunity." Erwin Chemerinsky, *Federal Jurisdiction,* § 7.3, at 335 (1989). *See Employees v. Department of Public Health and Welfare,* 411 U.S. 279, 313, 93 S.Ct. 1614, 1632, 36 L.Ed.2d 251 (1973) (Brennan, J., dissenting) ("*Hans* accords to nonconsenting States only a nonconstitutional immunity from suit by its own citizens"); Martha Field,

---

**10.** This conclusion is not altered by the fact that we today hold that Wisconsin's regime does not violate due process. While we might expect our exposition of federal constitutional law to inform a state court decision addressing the point, our decision does not bind the Wisconsin state courts. *See Freeman v. Lane,* 962 F.2d 1252 (7th Cir.1992) (the Supremacy Clause does not require Illinois Courts to follow Seventh Circuit precedent); *United States ex rel. Lawrence v. Woods,* 432 F.2d 1072, 1076 (7th Cir.1970), *cert. denied,* 402 U.S. 983, 91 S.Ct. 1658, 29 L.Ed.2d

148 (1971) ("because lower federal courts exercise no appellate jurisdiction over state tribunals, decisions of lower federal courts are not conclusive on state courts"); *State v. Webster,* 114 Wis.2d 418, 338 N.W.2d 474, 478 n. 4 (1983); *Stuart v. Farmers' Bank of Cuba City,* 137 Wis. 66, 117 N.W. 820 (1908). But in any case the point of § 1447(c) is that a federal court does not have the authority to dismiss a claim over which it never had jurisdiction in the first instance. The merits of the state law claim are therefore irrelevant to this determination.

*The Eleventh Amendment and Other Sovereign Immunity Doctrines: Part I*, 126 U.Pa. L.Rev. 515, 538–49 (1977); Vicki Jackson, *The Supreme Court, The Eleventh Amendment, and State Sovereign Immunity*, 98 Yale L.J. 1 (1988).

There is certainly some force to this view. Sovereign immunity is in many ways unlike a jurisdictional bar. For example, while it is clear that subject-matter jurisdiction in federal court cannot be obtained by consent or waiver, *Sosna v. Iowa*, 419 U.S. 393, 398, 95 S.Ct. 553, 556–57, 42 L.Ed.2d 532 (1975), states are free to waive sovereign immunity. Congress may also abrogate state sovereign immunity, *see Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), a conclusion very difficult to reconcile with the view that the Constitution does not give Congress the power to extend federal jurisdiction to suits against a state. In addition, in *Patsy v. Board of Regents of Florida*, 457 U.S. 496, 516 n. 19, 102 S.Ct. 2557, 2567–68 n. 19, 73 L.Ed.2d 172 (1982) (quoting *Edelman*, 415 U.S. at 651, 94 S.Ct. at 1350), the Court explained that while the Eleventh Amendment " 'sufficiently partakes of the nature of a jurisdictional bar' that it may be raised by the State for the first time on appeal," the Court noted that it had never held that it is jurisdictional in the sense that it "must be raised and decided by this Court on its own motion." *Id.* And finally, as recently as last Term's decision in *Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc.*, —— U.S. ——, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993), the Supreme Court concluded that interlocutory orders denying a state's claim of sovereign immunity are immediately appealable. In this sense, the Court treats an order denying sovereign immunity more like absolute or qualified immunity, which are subject to immediate review, *see Nixon v. Fitzgerald*, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982) and *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), than like an order denying a motion to dismiss on jurisdictional grounds, which is not immediately appealable. *Van Cauwenberghe v. Biard*, 486 U.S. 517, 526–27, 108 S.Ct. 1945, 1951–52, 100 L.Ed.2d 517 (1988); *Catlin v. United States*, 324 U.S. 229, 236, 65 S.Ct. 631, 635,

89 L.Ed. 911 (1945). *Compare* Comment, *The States Can Wait: The Immediate Appealability of Orders Denying Eleventh Amendment Immunity*, 59 U.Chi.L.Rev. 1617 (1992) (advancing the argument—rejected in *Metcalf & Eddy*—that because sovereign immunity is jurisdictional, orders denying sovereign immunity should not be immediately appealable).

All of this seems to counsel in favor of the view that sovereign immunity, at least in cases brought by citizens against their own state, is better understood as a common law immunity than as a constitutional bar to jurisdiction. But it is too late in the day to advance that argument in this court. In *Crosetto v. State Bar of Wisconsin*, 12 F.3d 1396 (7th Cir.1993), we squarely held that federal courts—per the *"Hans* doctrine"—lack subject-matter jurisdiction over suits against a state. The now-settled law of this circuit is that *Hans v. Louisiana* does not recognize a common law immunity, but rather holds that federal courts do not have subject-matter jurisdiction over suits against a state. And although, as we have noted, one can articulate an argument the other way, we do not today intend in any way to limit or question the force of our holding in *Crosetto*. That being the case, the district court did not have jurisdiction over Smith's claims against DATCP, and this claim must therefore be remanded to the state court. *See also McKay By and Through McKay v. Boyd Const. Co., Inc.*, 769 F.2d 1084 (5th Cir.1985) (remanding case back to state court, following removal, where defendant was entitled to sovereign immunity); *Frances J. v. Wright*, 19 F.3d 337, 340–42 (7th Cir.1994) (explaining *McKay* ).

## V. Lundeen's standing.

■ Lundeen is currently a dairy farmer with a Grade A permit, subject to the requirements of § Ag 60. But because he does not claim that he is "in imminent danger of having his Grade A permit suspended without a hearing," the district court found that he lacked standing, and therefore dismissed his complaint. Memorandum and Order (May 10, 1993) at 6.

In reaching this decision the court relied on *O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). There, the plaintiffs alleged that a magistrate and a judge discriminated against blacks in setting bail and in imposing punishment. But the Supreme Court concluded that the plaintiffs—who were not facing proceedings before the defendants—lacked standing. This was so, the Court held, because the "threat of injury from the alleged course of conduct [that the plaintiffs] attack is simply too remote to satisfy the 'case or controversy' requirement." *Id.* at 498, 94 S.Ct. at 677. *See also City of Los Angeles v. Lyons*, 461 U.S. 95, 111, 103 S.Ct. 1660, 1670, 75 L.Ed.2d 675 (1983) (holding that a person must allege a substantial likelihood that he will in the future be subjected to an allegedly illegal policy (there the policy of placing suspects in choke-holds) in order to have standing to seek an injunction against its enforcement); *Robinson v. City of Chicago*, 868 F.2d 959, 966–68 (7th Cir.1989), *cert. denied*, 493 U.S. 1035, 110 S.Ct. 756, 107 L.Ed.2d 773 (1990) (explaining *Lyons*); *Knox v. McGinnis*, 998 F.2d 1405, 1413–15 (7th Cir.1993).

Lundeen will surely be subject to inspections, though his permit will be suspended only if the DATCP inspectors find him repeatedly to be in violation of the safety standards. His injury is surely more "present" than that suffered by the plaintiffs in *Lyons* or *O'Shea*, though those cases do not clearly demarcate the class of injuries that are sufficiently present to confer standing. The parties, in arguing this case on appeal, offer differing interpretations of *Lyons*. This is not surprising, as commentators have shared our observation that the "full effect of *Lyons* is uncertain." Chemerinsky, *Federal Jurisdiction*, § 2.3. We agree with the district court's ultimate determination, although we find it somewhat more instructive to view this question through the lens of ripeness.

The doctrines of standing and ripeness are closely related, and in cases like this one perhaps overlap entirely. Both doctrines stem from Article III's requirement that federal courts have jurisdiction only over "cases and controversies." It is sometimes argued that standing is about *who* can sue while ripeness is about *when* they can sue, though it is of course true that if no injury has occurred, the plaintiff can be told either that *she* cannot sue, or that she cannot sue *yet*. *See* Gene R. Nichol, Jr., *Ripeness and the Constitution*, 54 U.Chi.L.Rev. 153, 173 (1987) (noting that the Supreme Court "appears to have used the two lines inquiry interchangeably").

 In any event the question in cases like Lundeen's is whether a party can seek pre-enforcement review of a statute or regulation. For ripeness purposes this determination appears to turn on two criteria: (1) the hardship to the plaintiff of denying pre-enforcement review and (2) the fitness of the issues for judicial review. While the interaction of these relationships is unclear, "it appears that pre-enforcement review is possible only if there is both hardship to its denial and an adequate factual record." Chemerinsky, *Federal Jurisdiction*, § 2.4. It would otherwise be difficult to explain the Court's determination that the dispute in *Poe v. Ullman*, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961) was unripe, since that case involved a purely legal dispute where there would have been little to gain by more fully developing the factual record.

Whether § Ag 60 satisfies the demands of the due process clause—like the question in *Poe*—is also an almost purely legal dispute. As such, the failure to develop a more complete record should not prevent the matter from being justiciable. But we do not think the hardship that Lundeen would suffer, were he required to wait until § Ag 60 was enforced against him before challenging the regime in court, is sufficient to justify pre-enforcement review.

The principle at work in the hardship analysis is that a plaintiff should not be required to face the Hobson's choice between forgoing behavior that he believes to be lawful and violating the challenged law at the risk of prosecution. For instance, in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), the Court allowed a number of drug companies to bring a pre-enforcement challenge to the FDA's authority to promulgate a regulation where violation of the regulation could subject the

companies to criminal punishment. By the same token, the Court allowed pre-enforcement review in *Steffel v. Thompson,* 415 U.S. 452, 462, 94 S.Ct. 1209, 1217, 39 L.Ed.2d 505 (1974), where the it emphasized the unfairness of placing "the hapless plaintiff between the Scylla of intentionally flouting state law and the Charybdis of foregoing what he believes to be constitutionally protected activity." *Compare Doe v. Bolton,* 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1973) ("The physician appellants, therefore, assert a sufficiently direct threat of personal detriment. They should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.").

But Lundeen faces no such Hobson's choice, since his objection is not to the substantive regulations themselves (that dairy cows need to be clean), but to the procedures that the state follows in suspending a farmer's permit after deciding that the farmer has violated its substantive rules. He is not required to forego a claimed right in keeping his cows clean. Therefore, unlike the plaintiffs in *Abbott Laboratories* and *Steffel,* Lundeen is not being asked to refrain from conduct that he alleges to be lawful. Lundeen's only alleged "right" is to have a hearing before Wisconsin yanks his Grade A permit. But until the state does so he has suffered no injury, his claim is not yet ripe. Whether this principle is labeled "standing" or "ripeness," Lundeen's claim presents no justiciable case or controversy.

■ While we therefore agree with the district court that Lundeen's claims cannot yet be heard in federal court, we believe that the district court erred in dismissing the claim. Standing and ripeness are jurisdictional prerequisites. *See Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984); *Family & Children's Center, Inc. v. School City of Mishawaka,* 13 F.3d 1052 (7th Cir.1994); *In re United States Catholic Conference,* 885 F.2d 1020, 1023 (2d Cir.1989) ("when a plaintiff lacks standing to bring suit, a court has no subject matter jurisdiction over the case"). Because Lundeen's claim is not yet ripe, the district court lacked subject-matter jurisdiction and was required under § 1447(c) to remand the claim to the state court from which it was removed. *See Maine Ass'n of Interdependent Neighborhoods,* 876 F.2d at 1055–56.

While some consider it odd that a state court might have the authority to hear a federal constitutional claim in a setting where a federal court would not, *see* William A. Fletcher, *The "Case or Controversy" Requirement in State Court Adjudication of Federal Questions,* 78 Cal.L.Rev. 263 (1990), it is clear that Article III's "case or controversy" limitations apply only to the federal courts, *ASARCO v. Kadish,* 490 U.S. 605, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989). Perhaps, were the claim remanded to Wisconsin state court, it would there be dismissed on state ripeness or standing grounds. But again, § 1447(c) says that a case removed to federal court "shall be remanded" to the state court if it is discovered that the federal court lacks subject matter jurisdiction. Wisconsin's doctrines of standing and ripeness are the business of the Wisconsin courts, and it is not for us to venture how the case would there be resolved. *See Maine Ass'n of Interdependent Neighborhoods,* 876 F.2d at 1055.

## VI. Due process.

■ This leaves only Smith's claims against the individual DATCP officers. The district court found that the individual officers enjoyed qualified immunity, and dismissed the claims against them because none of their actions violated Smith's clearly established rights. *Harlow v. Fitgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In our view, because the regulatory regime set out in § Ag 80 provided Smith with all of the process the Constitution requires, we affirm the dismissal of the complaints against the individual officers without relying on qualified immunity. *See Wade v. Hegner,* 804 F.2d 67, 70 (7th Cir.1986) (suggesting that if the conduct in question does not set out a constitutional violation, a court need not reach whether the constitutional standards were clearly established).

Under § Ag 80, state officials would visit Wisconsin dairy farmers twice a year. If they found a violation, they would inform the farmer of that determination. The farmer could then seek a hearing within 20 days of

the finding, in which she would be permitted to take issue with the inspector's conclusion. Approximately six months later, the inspector would return to the farm. If the violation was not corrected, the permit would be summarily suspended. No additional pre-deprivation hearing was available, though the farmer could again get a hearing within 20 days after the suspension.

Smith insists that this procedure deprives him of his due process rights. The Fourteenth Amendment forbids Wisconsin from depriving Smith of his property without affording him due process. And Smith's Grade A permit surely qualifies as a "property interest" as that term is understood. *See In re Reffalo,* 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968).

■ Due process typically requires the government to provide notice and a hearing before it takes away a property interest. "We tolerate some exceptions to the general rule requiring predeprivation notice and a hearing, but only in extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." *United States v. James Daniel Good Real Property,* — U.S. —, —, 114 S.Ct. 492, 501, 126 L.Ed.2d 490 (1993).

■ The parties therefore debate whether Wisconsin is required to provide farmers with a hearing before suspending a Grade A permit. As a general matter, the amount of process the government needs to provide before depriving an individual of her property is governed by the application of a three factor balancing test, set out in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Under *Mathews,* a court should weigh (1) the private interest affected by the official action, (2) the risk of an erroneous deprivation of the interest through the procedures used and the probable value of additional procedural safeguards, and (3) the government's interest, including the burden

that additional procedural safeguards would entail.

Applying this test, the Court has noted that there are occasions where due process will be satisfied if the government provides a hearing *after* the deprivation. Thus, where "the potential length or severity of the deprivation does not indicate a likelihood of serious loss and where the procedures underlying the decision to act are sufficiently reliable to minimize the risk of erroneous determination, government may act without providing additional advance procedural safeguards." *Memphis Light, Gas and Water Div. v. Craft,* 436 U.S. 1, 19, 98 S.Ct. 1554, 1565, 56 L.Ed.2d 30 (1978). There is also an "emergency exception" (not at issue here) to the rule requiring a pre-deprivation hearing. *Hodel v. Virginia Surface Mining & Reclamation Ass'n,* 452 U.S. 264, 299–300, 101 S.Ct. 2352, 2372, 69 L.Ed.2d 1 (1981).

The parties here dispute whether the loss of a Grade A permit is a sufficiently minimal deprivation [11] to allow DATCP to suspend a permit without a pre-deprivation hearing. A pre-deprivation hearing is required before the government can turn off utility services, *Memphis Light,* 436 U.S. at 1, 98 S.Ct. at 1556; deprive an individual of welfare benefits, *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) or deprive someone of their whole employee salary, *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). On the other hand, a post-deprivation hearing will suffice for the termination of government employment, *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974); the termination of Social Security disability payments, *Mathews,* 424 U.S. at 319, 96 S.Ct. at 895; suspending a person's drivers license for refusal to take a drunk-driving test, *Mackey v. Montrym,* 443 U.S. 1, 99 S.Ct. 2612, 61 L.Ed.2d 321 (1979) or suspending a race horse training license where illegal drugs are detected in the horse after a race,

11. A farmer whose Grade A permit was suspended was still permitted to sell his milk as Grade B, which at the time in question sold for 53 to 56 cents per hundredweight less than Grade A milk. And a farmer whose Grade A permit was suspended was able to seek reinstatement within hours or days of the suspension. Smith, however, argues that his Grade A permit was once suspended for almost three months (he does not indicate whether he sought reinstatement earlier) and lost almost $600 as a result.

*Barry v. Barchi,* 443 U.S. 55, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979).

But debating this case along those lines misses the point, because this is not a case where a hearing is available only *after* the deprivation. Grade A permits are suspended only on a finding of a *repeat* violation. And the state provides an opportunity for the farmer to seek a hearing on the *first* finding of a violation. There is, of course, no constitutional right not to have your permit suspended unless you have *twice* violated the safety regulations.[12]

Imagine a state regime in which a farmer's permit were suspended after a *single* violation of the safety regulations, but in which the suspension did not become effective until six months after the violation was discovered. As long as the farmer had an opportunity to seek a hearing on finding of the violation before the suspension would become effective, it could not be argued that such a regime violated the farmer's due process rights. The Constitution requires only that before a state deprive someone of a property interest, it provide them an adequate opportunity to be heard. This hypothetical regulatory regime would therefore satisfy the demands of the due process clause.

Wisconsin § Ag 80 provides Wisconsin dairy farmers with all of the process they would receive under this hypothetical regulatory framework, and further says that if the farmer corrects the violation in the intervening six months, it will not suspend her permit. Smith insists that he is also entitled to a hearing on the inspector's findings upon *reinspection.* But the Constitution does not require DATCP even to conduct a second inspection. While such reasoning is in other settings problematic, *see Posadas de Puerto Rico v. Tourism Co. of Puerto Rico,* 478 U.S. 328, 354–55 n. 4, 106 S.Ct. 2968, 2984 n. 4, 92 L.Ed.2d 266 (1986) (Brennan, J., dissenting), it is in this context clear that DATCP's greater power not to reinspect at all includes the lesser power to reinspect but not to allow

another opportunity for a hearing until after the deprivation. We therefore hold that by offering a dairy farmer the opportunity to seek a hearing on the first finding of a violation, the state provides all of the process that the Constitution requires. *See also Dixon v. Love,* 431 U.S. 105, 113, 97 S.Ct. 1723, 1727–28, 52 L.Ed.2d 172 (1977) (evidentiary hearing need not precede revocation of a driver's license based on repeated offenses in ten-year period where individual had opportunity for a hearing in connection with the individual offenses). Smith's claim for damages against the DATCP officers must therefore fail.

### VII. Conclusion.

Because the district court lacked subject matter jurisdiction over Smith's claims against DATCP and all of Lundeen's claims, the judgment dismissing these claims is VACATED and matter REMANDED to the district court with instructions to further remand these claims to the state court from which they were removed. The district court's judgment dismissing Smith's claims against the individual DATCP officers is AFFIRMED.

---

**12.** Keep in mind that the property interest at stake is in the Grade A permit. There is of course no property interest in the subsequent inspection, since procedural entitlements set out under state law "are not themselves property and will not be enforced in the name of the Constitution." *Archie v. City of Racine,* 847 F.2d 1211,

1217 (7th Cir.1988) (en banc), *cert. denied,* 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 809 (1989). *See also Hewitt v. Helms,* 459 U.S. 460, 471, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983); *Shango v. Jurich,* 681 F.2d 1091, 1100–01 (7th Cir.1982).